## MILLER et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 11, 1904.)

### No. 1,997.

1. UNITED STATES MAILS—SCHEME TO DEFRAUD—STATUTES—CONSTRUCTION.

The amendment of section 5480, Rev. St., by the act of March 2, 1889, 25 Stat. 873, c. 393, § 1 [U. S. Comp. St. 1901, p. 3696], did not detract from the effect of that section, nor limit its scope to the schemes, artifices, or devices prescribed in the amendment, or to those of like character, but it added to the offenses denounced by the original act those specified in the act of 1889.

2. INDICTMENT—REQUISITE AVERMENTS.

An indictment must allege the facts which constitute the offense charged so clearly that the court can determine upon inspection whether or not those facts will sustain a conviction under the law, so distinctly as to advise the accused of the charge he has to meet, so fully as to give him a fair opportunity to prepare his defense, and so particularly as to enable him to avail himself of a conviction or acquittal in defense of a second prosecution for the same offense.

8. UNITED STATES MAILS—CONSPIRACY TO DEFRAUD.

Facts which clearly show a conspiracy to devise a scheme or artifice to defraud, an intention to defraud, an intention to use the post-office establishment as a part of the scheme for the purpose of executing it, the use of that establishment for that purpose, and the scheme or artifice itself, are essential to a valid indictment under section 5440, Rev. St., to commit the offense described by section 5480 [U. S. Comp. St. 1901, pp. 3676, 3696], and must be alleged in the pleading.

4. SAME—INTENTIONAL FRAUDULENT USE OF LAWFUL CONTRACT MAY CONSTITUTE SCHEME TO DEFRAUD.

The intentional use of a legal contract or transaction for the purpose of defrauding another may constitute a scheme or artifice to defraud, under section 5480, Rev. St. [U. S. Comp. St. 1901, p. 3696], although the use of the same contract or transaction with an honest intent for a proper purpose would be lawful and innocent.

5. SAME—SUFFICIENCY OF DISCLOSURE IN INDICTMENT.

An indictment which charges the defendants with a scheme to use the post-office establishment of the United States, and a contract between the board of directors of a mutual insurance corporation and one of the defendants to procure from its members large sums of money, to appropriate these sums to the defendants, and thereby to render the corporation insolvent, fairly discloses a scheme to defraud the members of the corporation, under section 5480, Rev. St. [U. S. Comp. St. 1901, p. 3696], by inducing them, by means of communications through the post-office establishment, to pay their money into the possession and control of the defendants, to the end that they may defraud them of it.

6. SAME—AVERMENT THAT SCHEME IS "TO BE EFFECTED" BY USE OF MAILS DISCLOSES INTENTION TO SO USE THEM.

An allegation that a part of a scheme to defraud, which the defendants conspired to devise, was that the scheme "was to be effected" by opening correspondence or communication by means of the post-office establishment with unknown persons, is a sufficient averment of an intention by the accused to use the mails to execute their scheme.

7. SAME—INDICTMENT—OMISSION OF NAMES OF PERSONS TO BE DEFRAUDED.

An indictment which charges the accused with conspiring to devise a scheme to defraud persons unknown to the grand jury is not vulnerable because the names of these persons are not stated in the indictment, if it contains a true averment that these persons are not known to the grand jury.

133 F.—22

8. SAME—DEFRAUDING PERSONS UNKNOWN—NOT IMPAIRED BY SHOWING THAT PERSONS KNOWN WERE ALSO DEFRAUDED.

   It is not a valid objection to an indictment which charges the accused with conspiring to devise a scheme to defraud persons unknown to the grand jury that it shows on its face that the defendants were also guilty of the offense—with which they are not charged in the indictment—of conspiring to defraud persons known to the grand jury.

9. EVIDENCE—ADMISSIONS—ATTORNEY'S STATEMENTS—ADMISSIONS OF CLIENT.

   The statements in an attorney's argument and presentation of one case to a court or tribunal are not competent evidence against his client in another case between him and another party which involves other issues.

10. CONSPIRACY—PRIOR FRAUDULENT INTENT OF ONE ALLEGED CONSPIRATOR—EVIDENCE.

    Facts which show that one of several alleged conspirators had conceived a fraudulent intent before he entered into the conspiracy do not constitute competent evidence that his alleged co-conspirators, who had no knowedge of those facts, had such an intent before or at the time the conspiracy was formed.

(Syllabus by the Court.)

In Error to the District Court of the United States for the District of North Dakota.

C. A. Severance, Charles E. Wolfe, and Frank B. Kellogg, for plaintiffs in error.

Edward Engerud and Patrick H. Rourke, for the United States.

Before SANBORN, VAN DEVANTER, and HOOK, Circuit Judges.

SANBORN, Circuit Judge. Percy W. Miller, Arthur M. Gilder, and Allen G. Randall, the plaintiffs in error, who will be called the defendants in this opinion, were convicted under section 5440 of the Revised Statutes of conspiring to commit the offense of devising a scheme to use the post-office establishment of the United States to defraud, which is denounced by section 5480 of the Revised Statutes (U. S. Comp. St. 1901, pp. 3676, 3696). The indictment upon which they were tried contained four counts. The first charged them with the offense of conspiracy, described in section 5440, and the other three with the offense of devising a scheme to defraud, specified in section 5480. At the close of the trial the jury found them guilty under the first count, and acquitted them of the offense charged in the other three. This writ of error therefore challenges the trial under the first count only, and counsel for the defendants allege that they were wrongfully convicted, because this count of the indictment charged no offense, and because in the proceedings at the trial the court made numerous erroneous rulings.

The sufficiency of the indictment will first be considered. The general nature of the offense which the evidence on behalf of the government tended to charge upon the defendants at the trial was a conspiracy to devise a scheme to use the post-office establishment of the United States to defraud persons to the grand jury unknown, who were or became members of the State Mutual Insurance Company of North Dakota, by inducing these persons to pay moneys to that corporation in the belief that these moneys were necessary

for, and would be applied to, the payment of the legitimate expenses and genuine losses of the company, when in fact they were not requisite to pay these expenses or losses, and when they should be paid the defendants would have obtained control of the funds and business of the corporation, would convert this money to their own use, and would make the corporation insolvent and leave its losses unpaid, by means of a certain contract which they would then have obtained from the corporation to pay certain commissions to the defendant Gilder. The indictment is attacked on the grounds (1) that a scheme to defraud, of the character disclosed, is not violative of section 5480, since the amendment of that section by the act of March 2, 1889 (25 Stat. 873, c. 393, § 1); (2) that the indictment does not fairly disclose the scheme or artifice to defraud presented by the evidence for the government; (3) that it does not state the way in which the mails were to be used to effect the fraud; (4) that it fails to show that the use of the mails was a part of the scheme or artifice; (5) that it shows that the conversion of the money was the only unlawful act charged; that this conversion was not aided by the use of the post-office establishment; that it was effected after the scheme or artifice had been executed; and that the conversion was no part of that scheme; (6) that the indictment does not charge the defendants with intending to defraud a certain party whose name was known to the grand jury, and whom the indictment shows the defendants did intend to despoil; and (7) that the indictment does not allege that the defendants had any intention to defraud any one.

Section 5480 reads in this way:

"If any person having devised or intending to devise any scheme or artifice to defraud, or (to sell, dispose of, loan, exchange, alter, give away, or distribute, supply, or furnish, or procure for unlawful use any counterfeit or spurious coin, bank notes, paper money, or any obligation or security of the United States or of any state, territory, municipality, company, corporation, or person, or anything represented to be or intimated or held out to be such counterfeit or spurious articles, or any scheme or artifice to obtain money by or through correspondence, or by what is commonly called the 'sawdust swindle' or counterfeit 'money fraud,' or by dealing or pretending to deal in what is commonly called 'green articles,' 'green coin,' 'bills,' 'paper goods,' 'spurious treasury notes,' 'United States goods,' 'green cigars,' or any other names or terms intended to be understood as relating to such counterfeit or spurious articles, to) be effected by either opening or intending to open correspondence or communication with any person, whether resident within or outside the United States, by means of the postoffice establishment of the United States, or by inciting such other person or any person to open communication with the person so devising or intending, shall, in and for executing such scheme or artifice or attempting so to do, place or cause to be placed, any letter, packet, writing, circular, pamphlet. or advertisement in any postoffice, branch postoffice, or street or hotel letter box of the United States, to be sent or delivered by the said postoffice establishment, or shall take or receive any such therefrom, such person so misusing the postoffice establishment shall, upon conviction, be punishable by a fine of not more than five hundred dollars and by imprisonment for not more than eighteen months, or by both such punishments, at the discretion of the court. The indictment. information, or complaint may severally charge offenses to the number of three when committed within the same six calendar months; but the court thereupon shall give a single sentence, and shall proportion the punishment especially to the degree in which the abuse of the postoffice establishment enters as an instrument into such fraudulent scheme and device."

This section was originally enacted on June 8, 1872 (17 Stat. 323, c. 335, § 301). On March 2, 1889, the portion of it inclosed in parentheses was inserted by amendment. 25 Stat. 873, c. 393, § 1. The position of counsel for the defendants is that the effect of this amendment was to repeal the original section, and to enact another, in which the schemes and artifices denounced are restricted to those which are to be effected by means of some of the swindling devices or spurious articles specified in the amendment, or by means of some device or article of a similar character. In support of this contention they cite United States v. Beach (C. C.) 71 Fed. 160. But the construction of this amended section suggested in the opinion in that case, and pressed upon us by counsel for the defendants, does not commend itself to our judgment. The original act was leveled at the use of the post-office establishment to effect any scheme or artifice to defraud. The amendment was in the disjunctive. The statute, when amended, denounced any scheme or artifice to defraud, or any scheme or artifice of the character described in the amendment. Instead of limiting the offenses denounced to those specifically described in the amendment and to those of the same nature, it retained the original denunciation against every scheme or artifice to defraud, and added to it any scheme or artifice "to sell, dispose of, loan, exchange, alter, give away, or distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin," et cetera, as well as "any scheme or artifice to obtain money by or through correspondence or by what is commonly called the 'sawdust swindle' or 'counterfeit money fraud,'" or the other devices specified in the amendment. The only purpose of the construction of a statute or act of Congress is to ascertain or effectuate the intention of the legislators who enacted it. The act of March 2, 1889, when it is read in connection with the previous enactment, has forced the conviction upon our minds that it was the intention of the Congress by its passage not to subtract from, but to add to, the fraudulent schemes punishable under the original act, not to limit or restrict, but to enlarge and broaden, the scope and effect of that statute, to the end that the citizens might be more effectually protected from, and the mails might be purged of, the fraudulent schemes and devices described in the acts of Congress. The result is that the amendment of section 5480 by the act of March 2, 1889, did not detract from the effect, nor limit the scope, of the original act, to the schemes, artifices, or devices described in the amendment, or to those of a similar character, but its effect was to add to the offenses denounced by the original section those specified in the act of 1889. Culp v. United States, 82 Fed. 990, 992, 27 C. C. A. 294; Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Weeber v. United States (C. C.) 62 Fed. 740.

A minor objection to the indictment is that it contains an averment that the persons whom the defendants conspired to defraud are unknown to the grand jury, while it shows upon its face that, if they agreed to defraud any one, they conspired to defraud the State Mutual Insurance Company, and that the name of this company

was well known to the grand jury when the indictment was drawn. Conceding, without deciding, that the conspiracy of the defendants included a scheme to defraud the insurance company, as well as its members, although the latter must have been the actual sufferers from their fraudulent acts, the grand jury were not required to return an indictment against the defendants for conspiring to defraud the insurance company, and the fact that they did not do so cannot affect the validity of the indictment which they have presented. This indictment charges the defendants with a conspiracy to devise a scheme to defraud persons to the grand jury unknown only. It does not charge them with conspiring to devise a scheme to defraud the insurance company, because that company does not fall within the category of persons unknown to the grand jury. It is not a valid objection to an indictment which charges the accused with conspiring to devise a scheme to defraud persons unknown that it shows upon its face that they were also guilty of the offense—with which the indictment does not charge them—of conspiring to defraud persons known to the grand jury. The objection that the grand jury did not charge the defendants with conspiring to defraud the insurance company cannot be sustained.

Nor is it a tenable objection to an indictment that it fails to state the names of the parties whom the defendants are alleged to have conspired to devise a scheme to defraud, if it contains a true statement that these persons were unknown to the grand jury. Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Dunbar v. United States, 156 U. S. 185, 15 Sup. Ct. 325, 39 L. Ed. 390.

The contention upon which counsel for the defendants seem to rely most confidently is that the indictment does not disclose the scheme or artifice to defraud with the necessary clearness and certainty. Every man is presumed to be innocent until his guilt is established. When one is indicted for a serious offense, the presumption is that he is not guilty, and that he is ignorant of the supposed facts upon which the charge against him is founded. He is unable to secure and present the evidence in his defense— indeed, he is deprived of all reasonable opportunity to defend—unless the indictment clearly discloses the facts upon which the charge of the commission of the offense is based. It must set forth the facts which the pleader claims constitute the alleged transgression so distinctly as to advise the accused of the charge which he has to meet, so fully as to give him a fair opportunity to prepare his defense, so particularly as to enable him to avail himself of a conviction or acquittal in defense of another prosecution for the same crime, and so clearly that the court, upon an examination of the indictment, may be able to determine whether or not, under the law, the facts there stated are sufficient to support a conviction. United States v. Hess, 124 U. S. 483, 486, 487, 8 Sup. Ct. 571, 31 L. Ed. 516; United States v. Post (D. C.) 113 Fed. 852.

The use of the post-office establishment of the United States to execute a scheme or artifice to defraud, the intention to use it in this way as a part of the scheme or artifice, the scheme or artifice to defraud itself, and the intention of the defendants to defraud, are

essential elements of the offense described in section 5480 of the Revised Statutes; and allegations of facts which fairly show the existence of all these essentials, together with an allegation of a conspiracy to commit the offense, are indispensable to a valid indictment under section 5440. United States v. Ryan (D. C.) 123 Fed. 634; United States v. Clark (D. C.) 121 Fed. 190, 191; Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709. The intentional use of a legal contract or transaction for the purpose of defrauding another may constitute a scheme or artifice to defraud, under section 5480, although the use of the same contract or transaction with an honest intent to accomplish a laudable object would be lawful and innocent. Durland v. United States, 161 U. S. 306, 314, 16 Sup. Ct. 508, 40 L. Ed. 709; United States v. Loring (D. C.) 91 Fed. 881, 887.

A mutual insurance company organized under the laws of the state of North Dakota has no stock or stockholders, and is composed of the persons who are insured by the corporation, only. Rev. Codes N. D. 1899, § 3105. These insured persons are the members of the corporation. Its business is conducted by a board of directors chosen by the members. The members are liable to pay the expenses and losses of the company, and are entitled to all its profits, in proportion to the amounts and terms of their insurance. All the property of the corporation is held by its board of directors and officers, and all its business is conducted in trust for these members. They are the only parties liable for its obligations, and the only parties entitled to its gains, and their payments are the only source of its revenues. They are the real parties in interest in its property and in its business. Sections 3108–3114, 3086–3089, 2861. The indictment which the defendants challenge must be read in the light of these statutes of the state of North Dakota, in the light of the character of a mutual insurance company of that state and of its relation to its members, and in the light of the general rules of law and of pleading to which we have adverted. Let us so read the first count of this indictment for the purpose of ascertaining whether or not it fails to disclose the scheme to use the mails of the United States to defraud the unknown members of the State Mutual Insurance Company, which the evidence in behalf of the United States indicated that they had planned and executed, and which we have described. Omitting unnecessary verbiage, this indictment contains averments that the defendants conspired to commit the offense disclosed by these alleged facts: They devised this scheme or artifice to defraud divers persons to the grand jury unknown. The State Mutual Insurance Company was a purely mutual insurance company organized under the laws of the state of North Dakota. The defendants planned to cause the board of directors of this corporation to make an agreement or arrangement with the defendant Gilder to the effect that he should be the manager, and should have the possession of the funds and the control of the business of that corporation, and to cause them to appoint him such manager without the knowledge or consent of the members of the corporation who were not officers thereof, so that while

the property of the corporation would appear to be in the possession of, and its business would appear to be managed by, the officers chosen by its members, they would in fact be held and directed by the defendants. They intended, by means of Gilder's possession and control of the funds and business of the corporation, to procure and secure to themselves from the corporation and its members large sums of money, and thereby to cause the corporation to become insolvent. They were to effect this scheme by opening correspondence with divers persons to the grand jury unknown by the use of the post-office establishment of the United States. After, they had agreed upon this scheme, and after they had obtained possession and control of the funds and business of the corporation by means of the contract with Gilder, they placed in the post office at Hankinson, in North Dakota, to be sent and delivered by mail to their respective addresses, more than 2,000 letters directed to these unknown persons, of the tenor and effect of a certain letter which is set forth in the indictment, and which purports to have been written by the insurance company to one of its members, and to notify him that the board of directors of the corporation had made an assessment to pay losses, so that the amount of his obligation to the company was $21.60, against which he held a certificate of loss of $33.60, and that the balance due to him would be promptly paid. By means of these letters the defendants obtained $75,000 from the members of the corporation ostensibly to satisfy assessments levied to pay losses of the corporation. They did not pay the losses, but converted this money to their own use. The question is whether the foregoing facts adequately disclose the scheme to defraud which the evidence for the government tended to establish. Counsel argue that this scheme is not adequately disclosed, because the averments of the foregoing facts do not show by what means or by what method the defendants planned to fraudulently appropriate the money of the members of this corporation to themselves. They say that the indictment fails to show whether the large sums of money were to be secured by the defendants by means of the embezzlement of the funds by Gilder, by means of contracts made by him with his confederates without adequate consideration, or by one of a thousand other feasible but fraudulent ways not yet imagined. Is the indictment justly vulnerable to this criticism? Let us bear in mind that it does not charge a scheme to defraud the insurance company, but a scheme to use the post-office establishment of the United States to defraud persons to the grand jury unknown. Let us remember that the only persons connected with the insurance company who would suffer by the gathering and conversion of moneys ostensibly raised to pay the losses of the company were its members. Now, the indictment contains averments that the scheme of the defendants was to have Gilder secure the possession and control of the funds and business of the corporation by means of "a certain arrangement or agreement" between him and the board of directors, and that this scheme was to get from the corporation and from its members, and to secure to the defendants, large sums of money, to bankrupt the corporation, and to use the

post-office establishment of the United States as a part of this scheme to accomplish its object. When these averments are thoughtfully considered in the light of the fact that, under the law of its being, the only source of the corporation's revenues was the moneys to be collected from its members upon assessments to pay losses and expenses, that every dollar taken from the corporation was in reality taken from them, and that the insolvency of the corporation was in fact the misfortune of the members, it is difficult—indeed, it is impossible—to escape the conclusion that neither the defendants nor the court could have failed to perceive, upon an inspection of this count of the indictment, that it charged the defendants with devising a scheme to defraud the members of the insurance company by the use of the post-office establishment of the United States, through which the false notices of unnecessary assessments would be sent, and by the use of the contract or agreement between Gilder and the board of directors of the corporation.

It is said that the indictment discloses no scheme to defraud, because a contract with Gilder that he should be the general manager of the corporation, in possession of its funds and in control of its business, was a lawful agreement. But there are two answers to this proposition: In the first place, if a legal contract is conceived and intended to be used, and if it is actually used, to defraud or despoil another, the intentional procurement and use of it is a scheme or artifice to defraud. In the second place, this indictment charges much more than the mere procuring and using of the contract with Gilder. It charges that the defendants schemed and intended to use, and that they did use, the post-office establishment of the United States, together with the contract with Gilder, to procure from the members of the corporation, and to secure to themselves, large sums of money, and to make the corporation insolvent. The intentional bankrupting of the corporation by procuring and appropriating to themselves large sums of money which belonged to the corporation and to its members is inconsistent with an honest purpose, and indelibly stamps the entire scheme and transaction with bad faith and fraud.

It is contended that the averment that the scheme "was to be effected by the said Miller, Gilder, and Randall by opening correspondence and communication with divers persons to the grand jury unknown, by means of the post-office establishment of the United States," contains no notice that the plan charged was to communicate with the members by means of letters and circulars signed, sent, or received by the insurance company, and that communications of that character were inadmissible in evidence. But when it is considered that previous allegations had declared that it was a part of the scheme to place and keep the control of the business of the corporation in the hands of Gilder without the knowledge of the members who were not its chosen officers, and to procure the moneys which the defendants intended to, and did, appropriate to themselves from these members, this averment could not have failed to give to even the casual reader complete notice that it was a part of their scheme to use the name of the corpora-

tion and the mails of the United States to send misleading letters and circulars to the unknown members of the corporation to induce them to pay the moneys which the defendants sought to secure. Our conclusion is that the facts alleged in the first count of this indictment fairly disclose the scheme to defraud the members of the insurance company which the evidence for the government tended to prove, a scheme to defraud them by the use of the post-office establishment, to communicate to them misleading notices of unnecessary assessments, and the misleading appearance of the control of their corporation by the officers they had chosen, by means of which and of the contract with Gilder the defendants would procure and appropriate to themselves the moneys of the members.

After the pleader had averred in the first count of this indictment that the defendants conspired to devise a scheme to defraud unknown persons, and after he had alleged in his description of this scheme that the defendants were to get the possession of the funds and the control of the business of the corporation by means of the contract with Gilder, without the knowledge of the members who were not officers, and that they were to procure the large sums of money from the corporation and its members, to secure these sums to themselves, and to thereby render the corporation insolvent, he made this averment:

"And the scheme and artifice to defraud aforesaid was to be effected by the said Miller, Gilder, and Randall by opening correspondence and communication with divers persons to the grand jury unknown by means of the post-office establishment of the United States."

This allegation is challenged by counsel for the defendants again and again. They insist that it is insufficient (1) to show any intention to use the mails to commit the fraud; (2) to sustain the claim that the defendants conspired to use the mails as a part of their scheme to defraud; and (3) to permit proof of the use of the mails to transmit communications between the corporation and its members. The third objection has already been considered. The first is dignified by the sustaining opinion of Judge Wellborn in United States v. Long (D. C.) 68 Fed. 348, 350. It is, however, met by the stronger reasons and by the decision of the Supreme Court in Stokes v. United States, 157 U. S. 187, 189, 190, 15 Sup. Ct. 617, 39 L. Ed. 667. In that case the government first alleged that the defendants conspired to commit the offense described in section 5480 by devising a scheme to defraud persons unknown, and then alleged that the scheme was to be carried out by making certain representations; that it was to be further effected by ordering goods; and "that the post-office establishment of the United States was to be used for the purpose of executing such scheme and artifice to defraud" by opening correspondence with persons unknown. The court declared that the last averment was a sufficient statement of the defendant's intention to effect the scheme by the use of the post-office establishment. If this is the true interpretation of an allegation that the post-office establishment is to be used to execute the scheme, it must be the fair meaning of an averment that the scheme is to be effected by the use of that establishment,

for the two expressions are practically interchangeable. Moreover, this is the natural interpretation of the averment in the absence of all authority. It appears in the indictment as a part of the pleader's description of the alleged scheme to defraud which he averred the defendants conspired and agreed to devise. They could not have conspired and agreed to plan to effect their scheme by the use of the post-office establishment without an intention to use it for that purpose, and the averment that it was a part of the scheme they agreed upon to use the mails to execute that scheme is an adequate allegation of their intention to use them for that purpose.

The second objection is that the allegation challenged does not show that the defendants conspired to use the mails as a part of their scheme to defraud, and here it is confidently asserted that the averment fails because it does not set forth the method by which the defendants planned to use the mails—whether by correspondence to obtain the contract with Gilder, or to secure moneys from the members of the company. But when it is considered that the indictment contains no charge of a scheme to defraud the insurance company by means of the contract with Gilder or otherwise, when the earlier part of the indictment is read, its averments that the defendants conspired to devise the scheme to get control of the funds and business of the corporation to procure from its members their money, and to appropriate it to the defendants, when we consider that these averments are followed by this allegation that they planned to use the mails to effect this scheme, and when we remember that the members of the corporation were the only parties in interest in it, that their payments constituted its only source of revenue, and that it was their moneys that the pleader alleged the defendants conspired to secure, the fair and rational conclusion must be that the indictment shows with adequate clearness that the use of the post-office establishment to communicate with the members of the corporation to induce them to pay their money to the defendants was a part of the scheme to defraud which the defendants conspired to devise.

Another contention of counsel for the defendants is that the only unlawful act alleged in the indictment is the conversion of the money by the defendants that this is alleged to have taken place after all the acts conceived as parts of the scheme to defraud had been done, that the wrongful conversion was not attributable to any of those acts, and therefore that all the parts of the alleged scheme to defraud were lawful, and the indictment must fail. It is not true, however, that the conversion of the money was the only unlawful act alleged in the indictment, nor is it true that this conversion was not in any way attributable to the other acts which were a part of the scheme to defraud. The intentional use of the mails to procure from the members of the corporation moneys which the defendants intended to appropriate to their own use, the intentional use of the contract with Gilder to obtain this money for themselves, as well as the actual appropriation of it from members, were alike unlawful, as long as they were all conditioned, as the indictment alleges that they were, by the prior conspiracy of

the defendants to devise and to execute them as parts of their scheme to despoil the members of the insurance company.

Finally it is seriously argued that the indictment contains no adequate averment that the defendants ever had any intention to defraud any one, and the case of United States v. Post (D. C.) 113 Fed. 852, is cited in support of this proposition. The alleged facts in that case bear so little analogy to those here presented that the opinion in it is neither controlling nor persuasive. This indictment contains averments to the effect that the defendants conspired and agreed to devise a scheme to use the mails of the United States and the contract with Gilder to procure from the members of the State Mutual Insurance Company large sums of money, to appropriate these sums to the use of the defendants, and thereby to render the corporation insolvent. These allegations adequately disclose an intention on the part of the defendants to defraud the members of this corporation. They could not have committed the acts which they agreed to devise and to do without despoiling them, Every one is presumed to intend the natural and inevitable consequences of his acts. The defendants could not have agreed to do these acts, the patent consequence of which was to defraud the members of this corporation, without intending to defraud them. The objection that the indictment does not adequately show the intention of the defendants to defraud the members of the insurance company cannot be sustained.

The attack upon this indictment has been earnest, persistent, and determined. The objections to it have been carefully and patiently considered. It is seldom, if ever, that any pleading so clearly and concisely states the alleged facts that it might not be improved after the criticism of an assailant and the trial of a case; and it may be that, in the light of the argument of counsel for the defendants, a more admirable indictment could be drawn. But our conclusion is that this pleading fairly meets all the tests prescribed for a statement of the offense charged against the defendants.

Upon the trial of the case evidence was introduced which tended to show that in the year 1901 the defendants were in the control and management of the State Mutual Insurance Company of North Dakota under a contract between that company and Gilder made on January 19, 1901, which provided that he should be the general manager of the corporation, should receive 25 mills on all hail and 30 mills on all fire insurance applications written by the company during that year, and that he should pay all agents' commissions, express, telegraph, officers' salaries, and all other expenses of the company, except attorney's fees, postage, interest, losses, and exchange, and that he should also pay the existing indebtedness of the company, which was then $5,290.99. There was evidence to the effect that the unpaid losses of the company in December, 1901, were about $18,000; that the commissions of Gilder under his contract amounted to about $65,000; that the aggregate amount he was required to pay out under his agreement was about $30,000; that the defendants caused the members of the company to be assessed and to pay in more than $70,000 to satisfy alleged losses

and expenses; and that they appropriated to their own use more than $35,000 of these moneys, and made the corporation insolvent. In April, 1901, Mr. Charles E. Wolfe, an attorney at law, was retained by the corporation for the purpose of persuading the Insurance Commissioner of North Dakota to deny a certain rival insurance company the privilege of doing business in that state. Under this employment he wrote one letter to his client, the State Mutual Insurance Company of North Dakota, which is marked Exhibit 70, and four to the Insurance Commissioner, which are marked Exhibits 71, 72, 74, and 75. He enclosed in Exhibit No. 75 certain newspaper clippings. These letters and clippings contained statements relative to the acts of the officers of the rival company, the Farmers' Mutual Hail Insurance Company of Kansas City, which were calculated to persuade the Insurance Commissioner to refuse that company admission to the state of North Dakota. Evidence had been introduced that the information on which the statements in the letters to the Insurance Commissioner were based and the newspapers clippings had been furnished to the attorney, Wolfe, by one or more of the defendants, but there was no evidence that any of them ever saw the letters, or knew what statements they contained, before they were produced at the trial. In one of Wolfe's letters to the Insurance Commissioner, he vividly portrayed a scheme to defraud, of the character of that charged against the defendants in this case, and stated that the officers of the rival company had repeatedly devised and executed such schemes. In another letter he wrote that, in order to substantiate his charges, he must get the record of the officers of that company from Amboy, Minn., Omaha, Neb., Pierre, S. D., and Kansas City, Mo. One of the newspaper clippings contained what purported to be an account of a part of a trial of a charge against P. W. Miller, president, C. M. Harris, vice president, and C. C. White, treasurer, of the Grain Growers' Mutual Insurance Association of Omaha, for the embezzlement of $9,000 from the stockholders of that corporation. In this state of the record, the letters and clippings were offered in evidence on the part of the government for the purpose of showing the intent of the defendants, as their admissions that the insurance companies mentioned in the letters and clippings were schemes to defraud, and as their admissions that they participated in them before they organized the conspiracy charged in the indictment under which the trial was in progress. The defendants objected to them on the ground that they had no knowledge of their contents before the trial, and on the ground that Wolfe's authority as an attorney was limited to opposing the admission of the rival company to the state of North Dakota, and to acts pertinent to the trial of that issue. These objections were overruled, and the letters and clippings were read to the jury. This ruling seems to be erroneous. The crucial issue upon the trial was whether or not the defendants intended by the contract with Gilder, and by their operation under it, to defraud the members of the State Mutual Insurance Company of North Dakota. That issue had not arisen, it had not been suggested or imagined, it did not

exist, in April, 1901, when Wolfe wrote the letters and sent the clippings which were received in evidence. He had not been employed by the defendants to make any statements or admissions or to act in any way in their behalf in respect to this issue. The letter, Exhibit 70, was a communication from the attorney, Wolfe, to his client, the insurance company. It had no competency to prove any fact against or intent of the defendants, and it is here dismissed. The other letters were sent by Wolfe, with the newspaper clippings, to the Insurance Commissioner, to persuade him to refuse to admit the Kansas City insurance company to do business in North Dakota.

Conceding that the defendants were in effect the North Dakota insurance company, and that whatever power Wolfe had from that corporation he also had from the defendants, the limit of his authority was to make arguments and to present statements to the Insurance Commissioner on behalf of the defendants upon the single issue whether or not the Kansas City company should be permitted to do business in the state of North Dakota. Upon that issue, and in favor of the parties to that controversy, the acts and admissions of their attorney, Wolfe, were the acts and admissions of the defendants. But are these acts and admissions chargeable to the defendants in the trial of other issues between them and the United States, or other parties not interested in the issue before the commissioner? Unless Wolfe was authorized by these defendants to speak for them through the letters and clippings of April, 1901, upon the issue tried in this case in 1903, so that his admissions were their admissions, the letters and clippings he presented to the Insurance Commissioner did not rise to the dignity of hearsay, even. What the defendants admitted, if Wolfe had not this authority, was that which they said to him. If their communication to him was not privileged, and if Wolfe had related under oath exactly what they said or wrote to him upon the subjects treated in the letters and clippings, that statement would have been their admission. But the letters and clippings in evidence do not purport to contain what the defendants, or any of them, said or wrote to Wolfe or to any other person. The evidence goes no farther than to show that some of the defendants furnished the clippings and the information upon which Wolfe based the statements in his letters. The repetition of such communications as those which these defendants made to their attorney is always subject to great imperfections. It should be received with great caution. The parties who make the communication may not have correctly expressed their meaning. They may have been misunderstood. A slight alteration of the words, without any design of intentional misrepresentation, may have entirely varied the effect of their saying or writing. The repetition of such communications should never be received unless it appears with reasonable clearness that it is a correct statement of what the parties to be charged said or wrote. It should never be received unless it is clear that the saying or writing was brought home to their knowledge. How the defendants furnished the information to their attorney, whether they furnished it orally or in

writing, in what words they communicated it, the record contains not a shadow of evidence to show. There is no proof in it that any of the defendants knew the contents of any of the letters or of the clippings, or that any of them ever said or wrote that any of the statements therein were true. The fact is that the statements contained in the letters and in the clippings are nothing but the argument of defendants' attorney upon the trial before the commissioner of the issue of the admission of the rival company to North Dakota. If Wolfe had written to that officer that the defendants had told him or had written him that every statement in his letters and in the clippings was true, that statement would have been nothing but written hearsay, and would have been utterly incompetent as proof of an admission or of knowledge of the defendants. He did not do even this. He made the statements in his letters, and presented those in the clippings, not as the statements of his clients, but as his argument upon information furnished by them. The proverbial variance between a client's relation of the facts of his case to his attorney, and the latter's statement of them in his argument of the issue to the determining tribunal, marks the wide margin below the rank of hearsay, to which these letters and clippings must fall unless the attorney, Wolfe, was so authorized to speak and write for the defendants that his acts and writings in the case which involved the admission of the Kansas City company to do business in North Dakota were the acts and writings of the defendants upon their trial for conspiracy to devise a scheme to defraud two years later. Had he any such authority? Were his statements in his letters and the statements in the clippings from the newspapers which formed parts of his argument in that case the statements and admissions of the defendants in this case?

It is a general and a salutary rule that one ought not to be and cannot be prejudiced in the hearing and determination of any case or issue by the pleadings, arguments, or acts of his counsel in the trial of another case or proceeding which involved a different issue. Some of the reasons which have induced the establishment of this rule are (1) that an attorney employed to try one case or issue is not presumed to be instructed in, and is generally ignorant of, the facts which condition the other cases and controversies in which his client is interested; (2) that neither client nor attorney should be prejudiced in the subsequent trial of a case or issue not in the mind or contemplation of either by the attorney's allegations, admissions, or arguments in the trial of another case involving a different controversy; and (3) that the wide variance between the client's statement of the facts of a case to his attorney, and the latter's presentation of those facts at the trial of the issue it involves, is so marked and proverbial that the client ought not to be prejudiced by the latter's statement in any other case involving different issues. The courts, even, do not consider themselves bound by opinions which they may express upon issues which they are not deciding, when those issues subsequently arise for careful consideration and determination. In the execution and enforcement of the general rule to which reference has been made, Con-

gress has expressly provided that no pleading of a party, and no evidence obtained from him by means of any judicial proceeding, shall be given in evidence or in any manner used against him in any criminal proceeding (Rev. St. § 860 [U. S. Comp. St. 1901, p. 66]); and a similar provision is found in the statutes of North Dakota (Rev. Codes N. D. 1899, § 5281). If solemn admissions in a verified pleading are not competent evidence against a party who makes oath to them, when he becomes a defendant in a criminal proceeding, much less are the fugitive statements in the arguments of his counsel upon a different issue in a less formal proceeding. Admissions of counsel in one suit or proceeding are not competent evidence as admissions of his client to prejudice him in the trial of a different issue in another action or proceeding. Wilkins v. Stidger, 22 Cal. 232, 239, 83 Am. Dec. 64; Harrison's Devisees v. Baker, 5 Litt. (Ky.) 250; Elting v. Scott, 2 Johns. 157, 162; Phillips on Evidence, *479; Boileau v. Rutlin, 2 Exch. R. 665, 677; Doe d. Bowerman v. Sybourn, 7 Term R. 2, 3; Young v. Wright, 1 Camp. 139, 141; Parkins v. Hawkshaw, 2 Stark. 239, 240. The letters and newspaper clippings which the attorney, Wolfe, presented to the Insurance Commissioner upon the issue whether or not a rival insurance company should be permitted to do business in North Dakota, were not competent evidence against the defendants of their admission of the truth of any of the statements which those letters and clippings contained upon the trial in 1903 of the issue whether or not the defendants were guilty of a conspiracy to devise a scheme to defraud the members of the North Dakota company which they had operated.

For the same reason, these letters and clippings were not competent evidence that the defendants had any knowledge of any of the alleged facts stated in them. They were not evidence of such knowledge because Wolfe was unauthorized to admit for the purposes of the trial of the issue below that the defendants had this knowledge, and because, in the absence of such authority, the statements in the letters and clippings are much less competent than mere hearsay. The suggestion that the letters and clippings were properly received in evidence because they were a part of the things done by the defendants in execution of the alleged scheme to defraud is not persuasive. It is only those acts in execution of the scheme which have some tendency to prove or to disprove the charge that the defendants conspired to devise and execute it that constitute competent evidence upon the trial of the issue which that charge presents. The attempt to prevent a rival insurance company from doing business in a state has no such tendency. It is a proceeding as usual and characteristic of a legitimate insurance corporation as of an insolvent company, or of a fraudulent scheme to operate one. This evidence was not offered for any such purpose, but to prove the admissions and prior evil intent of the defendants; and, under the established rules of law to which reference has been made, it was not competent for any purpose. The receipt of these letters and clippings in evidence against the defendants was prejudicial and fatal error.

There is another reason why these exhibits should not have been admitted in evidence. They failed to show that any of the defendants were participants in any of the schemes to defraud which they mention, or that they had any knowledge concerning them before they formed the conspiracy for which they were tried below. They mention but two such schemes—that of the Kansas City company and that of the Grain Growers' Association of Omaha. The only suggestion of the connection of any of the defendants with either of these companies to be found in them is the narration of a part of the trial of Miller and others for embezzlement in one of the newspaper clippings where he is named as the president of the Omaha company. But this clipping from the newspaper was no evidence of the fact that he was ever the president of that company. It was nothing but hearsay of hearsay. Now, the theory of the offer of these exhibits was that they indicated the evil intent of the defendants, disclosed by their participation in the earlier schemes to defraud to which they refer. Inasmuch, therefore, as they did not tend to show that any of the defendants did participate in, or that they had knowledge of, those earlier schemes, they did not tend to show their evil intent in entering upon this scheme, and they had no place in the evidence against the defendants.

One of the important issues in the case was whether or not the plan of the defendants was a scheme to operate the State Mutual Insurance Company temporarily for a few months for the purpose of defrauding its members, or a plan to establish and operate a permanent and successful insurance business. If the contract with Gilder was so unfair and unconscionable as to imply fraud and bad faith, that fact tended distinctly to show that their plan was to defraud the members of the company, while, if the agreement with Gilder was just and fair, that fact would go far to persuade to the opposite conclusion. In December, 1901, the unpaid losses of the company were about $18,000. At that time the board of directors of the company defeated a motion made by Gilder to authorize the company to renew his contract for another year; and when Gilder was upon the stand his counsel asked him whether or not, in connection with his application for a renewal of his contract, any proposition was made by him to the company in relation to the procurement of money to satisfy its unpaid losses, and the court refused to permit him to answer the question upon the ground that the inquiry was irrelevant. The presumption from the record is that the answer, if it had been received, would have been favorable to the defendants; that it would have been that the witness offered to obtain the money and to pay the unpaid losses of 1901, as he had agreed to pay those of the year 1900. If he was willing and offered to assume the burden of these losses in consideration of a renewal of his agreement, that fact would indicate much more strongly that his plan and purpose were to establish a permanent and successful business, than it would that he intended to bankrupt the corporation and to defraud its members by making their contracts of insurance worthless. The question related to the issues, and the witness should have been permitted to answer it.

In view of the fact that this case must be retried, attention is called to a few questions which may not be so presented that any ruling of the court upon them is properly challenged. In some instances books of record which were incompetent as evidence were admitted for reference only, and then witnesses who had no knowledge of the facts disclosed by the books, except such as they derived from an examination thereof, were permitted to testify what facts these books disclosed. Obviously, if books are not themselves competent evidence of the facts they relate, the testimony of witnesses who do not know these facts, and who did not prepare the statement of them contained in the books, cannot be competent evidence of the facts there disclosed, and the admission of the books for reference only cannot change the rule. After books are properly proved and admitted in evidence in proof of facts which they recite, a witness may examine them, summarize their evidence, and testify to the summary. But this may be lawfully done only when the books themselves are competent evidence of the facts summarized, or when they constitute memoranda made by the witness which can be used to refresh his memory of the facts.

In the course of the attempt of the government to establish the intent of the defendants by their alleged participation in earlier schemes to defraud, it introduced evidence which it claimed indicated that the Grain Growers' Association of Omaha and the Farmers' Mutual Hail Association of Watertown were formed and conducted in the same way as was the State Mutual Insurance Company of North Dakota. But it did not produce any evidence which had any tendency to show that the defendant Gilder participated in, or was aware of, the organization or operation of either company before he engaged in the organization of the North Dakota company, or that the defendant Randall was before that time aware of, or in any way connected with, the Grain Growers' Company. At the close of the evidence for the plaintiff, and again at the close of all the evidence, Gilder made a motion to strike out, as to him, the evidence relative to both these companies, and also relative to the Western Farmers' Company of Topeka; and Randall moved to strike out, as to him, the evidence in reference to the Grain Growers' Company, and also relative to the State Mutual Hail Insurance Company of Hankinson. These motions were denied, and the court did not instruct the jury that any of this evidence should not be considered by them in determining the guilt or innocence of the defendants who did not participate in the organization or management of any of these companies. These companies were organized and operated before the conspiracy to defraud charged in this case was formed. The knowledge and intent of one of the defendants prior to the formation of the conspiracy in issue constituted no evidence of the knowledge or intent of the others, and even if the defendant Miller was aware of, or connected with, the formation and conduct of these earlier companies, that fact did not tend to show any knowledge or fraudulent intent of Gilder before or at the time the conspiracy on trial was formed. If Gilder and Randall had no connection with or knowledge of the operation of the Grain

Growers' Association before they entered into the alleged conspiracy upon trial, the formation and conduct of that company could not have indicated that they had conceived any fraudulent intention when they entered upon the scheme which is challenged in this case, and, as to them, the evidence concerning the Grain Growers' Association should have been withdrawn from the jury. Nevertheless the motions were properly denied because they were too broad. They included the evidence in reference to the Topeka company, with which Gilder was connected, and in reference to the Hankinson company, in which Randall may have been interested.

The judgment below is reversed, and the case is remanded to the District Court, with instructions to grant a new trial.