FONTANA v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. December 8, 1919.)

No. 5295.

1. INDICTMENT AND INFORMATION ⬅176—VARIANCE OF PROOF AS TO TIME OF OFFENSE NOT MATERIAL, WHERE WITHIN LIMITATION PERIOD.

The averment in an indictment that defendant made statements violating the Espionage Act on a specified day was a mere formal jurisdictional allegation, which permitted the government to show that such statements were made at any time before the indictment was filed within the statute of limitations and after passage of the Espionage Act.

2. CONSTITUTIONAL LAW ⬅265—INDICTMENT, TO CONSTITUTE DUE PROCESS OF LAW, MUST DISTINCTLY AND SPECIFICALLY CHARGE OFFENSE.

In order to constitute due process of law, an indictment must not only inform accused that there is a charge against him, but must be sufficiently distinct and specific to advise him what he has to meet and to give him a fair and reasonable opportunity to prepare his defense.

3. CRIMINAL LAW ⬅308—INDICTMENT AND INFORMATION ⬅55—TESTING ON PRESUMPTION THAT ACCUSED HAS NO KNOWLEDGE OF FACTS CHARGED.

A person indicted for a serious offense is presumably innocent, and the

sufficiency of an indictment must be tested upon the presumption that he is innocent, and has no knowledge of the facts charged against him.

**4. INDICTMENT AND INFORMATION ☜71—REQUIREMENTS AS TO DEFINITENESS STATED.**

An indictment must set forth the facts so distinctly as to advise accused of the charge, and give him a fair opportunity to prepare his defense, so particularly that a conviction or acquittal would bar another prosecution for the same offense, and so clearly that the court may determine whether the facts stated support a conviction.

**5. WAR ☜4—INDICTMENT UNDER ESPIONAGE ACT HELD INSUFFICIENT.**

An indictment charging that nine statements of accused uttered in a certain town violated the Espionage Act, but not identifying the occasions upon which the statements were made, held insufficient, because not specifically advising accused of the charge he would be required to meet, and not sufficiently definite to be pleaded in bar of a subsequent prosecution.

**6. CRIMINAL LAW ☜295—BAR TO SUBSEQUENT PROSECUTION DEPENDS ON INDICTMENT, AND NOT EVIDENCE ADDUCED ON FORMER TRIAL.**

Whether a conviction or acquittal is a bar to a subsequent prosecution must be determined from the indictment and judgment at the former trial, and the evidence on such trial cannot be considered, because not a part of the judgment.

**7. WAR ☜4—INDICTMENT UNDER ESPIONAGE ACT INSUFFICIENT.**

An indictment charging that accused made nine statements violating the Espionage Act, but not specifying the circumstances under which they were made, held insufficient, where, if made in a public address advocating the results alleged in the indictment in the presence of members of the military or naval forces of the United States, or of those eligible to become such members, or, if circulated among such men, they might be calculated to produce such results, but if uttered in private conversations, or in discussion with or in the presence of loyal men of ordinary intelligence, in the absence of other circumstances to indicate the evil intents alleged, they would be susceptible to the inference that they were made with the intents charged.

**8. INDICTMENT AND INFORMATION ☜63—CONCLUSIONS REGARDING INTENT TO VIOLATE LAW NOT SUFFICIENT.**

When language does not constitute a crime, if uttered under some circumstances, but does, if uttered under others, it is not enough for an indictment to charge that the language was used with intent to violate the law, since that would be a mere conclusion of the pleader.

**9. WAR ☜4—EVIDENCE INSUFFICIENT TO SUSTAIN ESPIONAGE ACT CONVICTION.**

In prosecution for violating the Espionage Act, evidence that accused's utterances after passage of the act constituted only a sentence or two in a sermon and statements to persons soliciting Red Cross subscriptions in accused's house, etc., held insufficient to sustain a conviction.

In Error to the District Court of the United States for the District of North Dakota; Charles F. Amidon, Judge.

J. Fontana was convicted of violating the Espionage Act, and he brings error. Reversed and remanded, with directions to discharge defendant.

John Knauf, of Jamestown, N. D. (B. W. Shaw, of Mandan, N. D., on the brief), for plaintiff in error.

M. A. Hildreth, U. S. Atty., of Fargo, N. D. (John Carmody, Asst. U. S. Atty., of Fargo, N. D., on the brief), for the United States.

Before SANBORN, CARLAND, and STONE, Circuit Judges.

SANBORN, Circuit Judge. The defendant below was convicted of three violations of section 3 of the Espionage Act of June 15, 1917 (40 Stat. p. 217, c. 30 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c]), and sentenced to three years in the penitentiary under an indictment containing three counts which charged that by saying the same words on or about December 19, 1917, he

(1) Willfully made and conveyed false reports with the intent to interfere with the operation and success of the military and naval forces of the United States and to promote the success of its enemies, to the injury of the United States;

(2) Willfully caused and attempted to cause insubordination, disloyalty, and refusal of duty in the military and naval forces of the United States, to its injury; and

(3) Willfully obstructed the recruiting and enlistment service of the United States, to the injury thereof.

The defendant demurred to the indictment, and the demurrer was overruled. At the close of the evidence he moved for a directed verdict, on the ground that there was no substantial evidence to sustain a verdict against him, and this motion was denied, and he made a motion in arrest of judgment, and that motion was denied. These rulings are assigned as error.

Counsel for the defendant insist that the indictment was insufficient, because it did not set forth the facts which the pleader claimed constituted the violations charged so distinctly as to advise him of the charges he had to meet and to give him a fair opportunity to prepare his defense, nor so particularly as to enable him to avail himself of a conviction or acquittal in defense of another prosecution for the same offense.

The indictment charged that the three offenses were committed on or about December 19, 1917, at New Salem, a town in North Dakota, during the war between the United States and the Imperial German government, with the respective intents denounced by the statute, by falsely stating:

(1) That President Wilson was a man who, after securing his election on the slogan "kept us out of war," turned squarely around and by the use of his high office of President whipped the members of Congress into line by threats of exposure of this one and that one, and in this way secured the authority to enter the war with Germany;

(2) That he felt proud of the noble fight the Germans were making in the war;

(3) That the sinking of the Lusitania was justified, and that there was no reason whatever for the United States taking up arms against Germany;

(4) That he frequently prayed for the success of the armies of Germany over the armies of the United States;

(5) And stated to his congregation and to divers persons, whose true names are to the grand jurors unknown, false and injudicious statements as aforesaid;

(6) That he did not want to subscribe for Liberty Loan Bonds, because it would tend to encourage the administration;

(7) That the President was using the same methods of threats to force every bank within the United States to subscribe to Liberty Loan Bonds;

(8) That the purchase of Liberty Loan Bonds would give the country more money to fight Germany and thus prolong the war;

(9) That he desired the success of the enemies of the United States.

[1] The averment in the indictment that the defendant made these statements on or about December 19, 1917, was a mere formal jurisdictional allegation, which permitted the introduction of evidence of any of them at any time before the indictment was filed within the statute of limitations, and there was nothing but that formal statement and the allegation that the statements were made at New Salem to indicate at what time, under what circumstances, on what occasions, to whom, in whose presence, or by what persons the government would attempt to prove that the defendant had made any of these statements, nothing to indicate to him whether he was to be tried for making all of them at one time, on one occasion, or for making some of them at one time to one person, and others at other times and on other occasions to other persons.

[2, 3] The basic principle of English and American jurisprudence is that no man shall be deprived of life, liberty, or property without due process of law; and notice of the charge or claim against him, not only sufficient to inform him that there is a charge or claim, but so distinct and specific as clearly to advise him what he has to meet, and to give him a fair and reasonable opportunity to prepare his defense, is an indispensable element of that process. When one is indicted for a serious offense, the presumption is that he is innocent thereof, and consequently that he is ignorant of the facts on which the pleader founds his charges, and it is a fundamental rule that the sufficiency of an indictment must be tested on the presumption that the defendant is innocent of it and has no knowledge of the facts charged against him in the pleading. Miller v. United States, 133 Fed. 337, 341, 66 C. C. A. 399, 403; Naftzger v. United States, 200 Fed. 494, 502, 118 C. C. A. 598, 604.

[4-6] It is essential to the sufficiency of an indictment that it set forth the facts which the pleader claims constitute the alleged transgression, so distinctly as to advise the accused of the charge which he has to meet, and to give him a fair opportunity to prepare his defense, so particularly as to enable him to avail himself of a conviction or acquittal in defense of another prosecution for the same offense, and so clearly that the court may be able to determine whether or not the facts there stated are sufficient to support a conviction. United States v. Britton, 107 U. S. 665, 669, 670, 2 Sup. Ct. 512, 27 L. Ed. 520; United States v. Hess, 124 U. S. 483, 488, 8 Sup. Ct. 571, 31 L. Ed. 516; Miller v. United States, 133 Fed. 337, 341, 66 C. C. A. 399, 403; Armour Pkg. Co. v. United States, 153 Fed. 1, 16, 17; 82 C. C. A. 135, 150, 151, 14 L. R. A. (N. S.) 400; Etheredge v. United States, 186 Fed. 434, 108 C. C. A. 356; Winters v. United States, 201 Fed. 845, 848, 120 C. C. A. 175, 178; Horn v. United States, 182 Fed. 721, 722, 105 C. C. A. 163, 167. If the pleader had set forth in this indictment any

fact or facts, such as the time, place, occasion, circumstances, persons present, or any other distinctive earmark whereby the defendant could have found out or identified the occasion or occasions when the government intended to attempt to prove that the defendant uttered any of the nine sayings charged he might have been able to investigate the basis of the charges, to learn who were or were not present on the occasions referred to, hence who were possible witnesses, and to prepare his defense; but there is nothing of that kind in the indictment. As it reads, he might have been called to meet on each of the nine charges testimony that at any time of day or night, at any place in New Salem, on any occasion, public or private, before the indictment was filed, and after the Espionage Act was passed on June 15, 1917, he had uttered to any one whomsoever any of the statements charged in the indictment. These considerations compel the conclusion that this pleading signally failed to state the facts which the government claimed constituted the alleged offense in this case, so distinctly as to give the defendant a fair opportunity to prepare his defense to meet any of them, and that he could not and did not have that notice of them required to give him a fair trial.

Nor were the charges in this indictment so certain and specific that upon conviction or acquittal thereon it or the judgment upon it constitute a complete offense to a second prosecution of the defendant for the same offense. In determining this question the evidence on the trial may not be, and the indictment and the judgment alone can be, considered, because the evidence does not become a part of the judgment, and as the indictment states no facts from which the time, places, or occasions on which the respective statements therein were alleged to have been made can be identified, the indictment and judgment failed to identify the charges so that another prosecution therefor would be barred thereby. Florence v. United States, 186 Fed. 961, 962, 964, 108 C. C. A. 577, 578, 580, and cases there cited; Winters v. United States, 201 Fed. 845, 848, 120 C. C. A. 175, 178.

[7, 8] Moreover, there is no such clear statement in the indictment of the facts which the government claims constituted the offenses charged as enables a court fairly and justly to determine that they would sustain a conviction. If the statements charged, when considered in the light of the times and circumstances under which they were uttered, were reasonably calculated to effect the results averred, the indictment was sufficient to require the court to send the case to the jury. If, on the other hand, upon its face, in the light of the times and circumstances it disclosed, the facts pleaded in the indictment were not reasonably susceptible to the inference that the statements were made by the defendant with the intent to interfere with the operation and success of the military and naval forces of the United States, and to promote the success of its enemies to the injury of the United States, or to cause or attempt to cause insubordination, disloyalty, and refusal of duty in the military and naval forces of the United States to its injury, or to obstruct the recruiting and enlistment service of the United States to the injury thereof, the demurrer should have been sustained. "The question in every case," said Mr. Justice Holmes in

Schenck v. United States, 249 U. S. 47, 52, 39 Sup. Ct. 247, 248, 63 L. Ed. 470, "is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."

The statements set forth in this indictment are such that, if uttered under some circumstances, as, for example, in a public address advocating in the presence of the members of the military or naval forces of the United States, or of those eligible to become such members, or if written and circulated among such men, they might be calculated to produce the results alleged. But there is none of these statements that, if uttered in private conversations or discussion with or in the presence of loyal men of ordinary intelligence, in the absence of other circumstances to indicate evil intents, susceptible to any such inference. Illustrations of the case of the former class are Doe v. United States, 253 Fed. 903, 166 C. C. A. 3; O'Hare v. United States, 253 Fed. 538, 165 C. C. A. 208. Illustrations of the latter class are Von Bank v. United States, 253 Fed. 641, 165 C. C. A. 267; Wolf v. United States, 259 Fed. 388, —— C. C. A. ——. As was said by Judge Carland in the Von Bank Case:

"The jury * * * had no right to find a criminal intent, unless such intent was the necessary and legitimate consequence of the words spoken."

Whether or not the statements in the indictment were reasonably calculated to indicate the intents stated, or to "create a clear and present danger" of the results alleged, was conditioned by the time and circumstances in which they were said. It is an elementary rule of criminal law that when language does not constitute a crime if uttered under some circumstances, and does constitute a crime if uttered under other circumstances, it is not enough to charge that it was used with intent to violate the law. That would be a mere conclusion. The facts must be set forth, so that the court can determine, and not the pleader, whether or not they constitute the crime. United Staes v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516; United States v. Cruikshank et al., 92 U. S. 542, 23 L. Ed. 588; United States v. Carll, 105 U. S. 611, 26 L. Ed. 1135; Shilter v. United States, 257 Fed. 724, 725, —— C. C. A. ——.

Take, for example, the first charge in the indictment, that the President secured his election on the slogan "kept us out of war," and by using his high office whipped the members of Congress into line to secure the authority to enter the war. If that statement was made in a private conversation with a loyal citizen, in the presence of no other person, his utterance of it was not susceptible to the inference that he made it with any of the evil intents charged, or to the inference that it was reasonably calculated to produce the results alleged. Perhaps, however, if it had been made in a public address, in the presence of men who were members of the military or naval forces of the United States, such an utterance might, in view of other things said in the same address, have been susceptible to a different inference. Take the fifth statement, that he "stated to his congregation and to divers persons, whose true names are to the grand jurors unknown, false and in-

judicious statements as aforesaid." That charge is so indefinite and ambiguous that it is clearly insufficient to warrant the introduction of any evidence under it. No court can determine from it whether it means that he made the statements preceding it, or that he made other injudicious statements to them, in the same way that he made the preceding statements. The allegations in the indictment regarding the other statements are likewise indefinite and insufficient, and for the reasons which have been suggested the demurrer to the indictment should have been sustained, and the defendant should have been discharged without a trial.

[9] When, at the close of the evidence, the defendant's counsel moved for a directed verdict, the setting of time, situation, and circumstances which the testimony had supplied had not improved the case stated by the government in the indictment. There was conflicting testimony on some of the issues, but the evidence of these facts was uncontradicted. The defendant was born in Germany; his father was an Italian, and his mother was a German. He came to the United States when he was 16 years of age. In 1917 he was 45 years of age. He was a full citizen of the United States. He was, and for eight years had been, the pastor of the German Evangelical Church of New Salem in North Dakota, which had a congregation of about 200 people, who lived in that town and on the farms around it within five or six miles. He had a wife and five children, the oldest of whom was 14 and the youngest of whom was 2 years old. The war was declared on April 6, 1917. The law which he was charged with violating was enacted June 15, 1917. Four of the members of his congregation enlisted in, and 34 or 36 entered, the military and naval forces of the United States during the war. On the second Sunday after April 6, 1917, he addressed his congregation from his pulpit in substantially these words:

"We are now at war with the old Fatherland. This is our country. We adopted this country when we became citizens of the United States, and we promised and swore to the Constitution that we would stand by this country. Now is the time to prove and show it that we are willing to do our duty, and I ask you to do your duty as a citizen of the United States, and to give up everything, if it has to be, to the last man."

Every Sunday during the war he prayed in his pulpit, in the presence of his congregation for God to bless our country, our people, our President, our congregation, and to help that they may serve to promote the sanctification of His name and welfare of His people; that He would stop the war through his mercy; that He would prevent bloodshed and devastation and give us an honorable peace. A witness for the government testified that on one occasion between April 8 and May 29, 1917, he prayed for our old Fatherland, that God would give him victory over his foes and destroy and shatter all who wants his evil. But this was before the Espionage Act was passed, and many witnesses came to testify that he made no such prayer after war was declared. Another witness testified that during a few Sundays just after April 6, 1917, he prayed for His blessing for the old Fatherland and for the new Fatherland, that peace between them might not be broken,

that bloodshed between them might be avoided, and that those who would break off peaceful relations be hindered in their efforts. But this was also before the passage of the act of June 15, 1917. One witness for the government testified that, in answer to this question asked over the telephone regarding a sermon the defendant had delivered on a certain day in August, 1917, to wit, "I understood you to say in your sermon to-day that, as the Lord was with his people, the children of Israel, and helped them to overcome their enemies, so he gave the German people ways and means to stand off their enemies of the world," he answered, "Yes, I believe I did." Another government witness testified that what he said in that sermon was, "God specially blessed the German people because they had the submarines as a means of warfare," but the larger number of the witnesses and the great weight of the testimony was that he did not make these statements, but that at the close of a sermon on "Temptation to Sin," on that day in August, he said in substance:

"Germany, in her fight against a great number of enemies, has a weapon which enabled her to hold out until now; but God has given every Christian a weapon with which he can defeat all temptation at all times, namely, prayer. Watch and pray that ye enter not into temptation. The Spirit indeed is willing, but the flesh is weak."

The substance of all the evidence there is in this case relative to any public statements, writings, or prayers made by the defendant has now been recited. In it all—

(1) There is no evidence whatever that he ever made any of the nine statements set forth in the indictment to his congregation or to any one on any public occasion, and there is no such evidence in this case.

(2) All of the evidence recited, except that with reference to the sermon in August, relates to expressions used prior to June 15, 1917, for the use of which he could not be convicted if they had been charged.

(3) Even if the expressions in the sermon on "Temptation to Sin," to which the government's witnesses testified, were used, they were not reasonably calculated, in view of the fact that they were but a sentence or two, in a sermon occupying some 20 or 30 minutes on "Temptation to Sin," and were used merely for the illustration of the argument the defendant was making, to indicate any criminal intent or purpose, much less to sustain a finding that such intent inspired and caused them. So it is that there was no evidence in this case of any public advocacy or suggestion or insinuation by the defendant of any of the evils the United States was endeavoring to prevent by the act of June 15, 1917, or of any views tending to prove any of the evil intents denounced by the law.

There was conflicting evidence on the issues whether or not the defendant made to certain private persons in his own house and in other private places some of the statements written in the indictment. This was the setting of the first statement therein with reference to the President's election and his use of his power to secure authority to conduct the war. The cashier of a bank in New Salem went to the defendant's

home, and in his presence and in the presence of his wife, but in the presence of no other person, asked him on October 24, 1917, to subscribe for Liberty Bonds. The defendant had a wife and five children under 15 years of age. His salary was $1,000 per year, out of which he supported them. He owned $1,000 stock in a bank, and owed over $2,000. He declined to subscribe then, although later he did so. He and his wife testified that he told the banker that he was not able to subscribe; that the banker offered to loan him the money to pay for his bonds at 6 per cent., but that he said he could not afford to pay the interest or the principal. The banker denied these statements, testified that nothing was said about financial matters, but that the defendant said he did not want to do anything to use his influence to help out the administration on the war, because the President was elected on the slogan, "He kept us out of war," and then afterwards he used his power as President to put us into war, by telling the members of Congress that he would expose them to the light, and in that way forced the country into war; that he said that the sinking of the Lusitania was a humane act on the part of Germany, because there were munitions on board, and by sinking it a lot of lives in Germany were saved; and that he said that he was very proud of the fight the German people were making.

The defendant testified that all he said about getting into the war was that he believed the country was ready for peace, because he believed that the President was elected on account of the slogan, "He kept us out of war," and that it seemed to him that after he was elected he was in favor of the war; that he never talked with the banker about the Lusitania; that he never said to him that he was proud of the fight the Germans were making; that he never told him he would not subscribe for Liberty Bonds because it would encourage the administration, but that he did tell him that he would not buy any bonds of him anyhow, because, if he had the money, he would buy the bonds of the bank where he did his banking business. He testified further, and this testimony was not contradicted, that what he said after he had declined at the commencement of the conversation to buy the bonds was in answer to questions of the banker; that the banker asked if he did not think the bonds were a good investment, and he answered that he thought they were; that he wished he had a lot of money, he would invest it in Liberty Bonds; that the banker asked what he thought of the draft law, and he replied that he thought it a good law, and that we ought to have had it a couple of years before the war.

The record in this case has been searched in vain for evidence that the defendant, before the indictment was filed, ever made in public or in private to any one the fourth, fifth, seventh, eighth, or ninth statements alleged therein, and the conclusion is that there never was any testimony in support thereof. The only evidence that the defendant made the first, second, third, and sixth statements, or any part of them, is the testimony of the banker which has been recited, and upon this testimony the verdict rests. There are a great many pages of the record which recite evidence permitted to be presented to the jury upon the question of the defendant's intent, which relate to collateral

issues, such as what the defendant said about subscribing to the Red Cross, in view of the fact that he had read in some paper that it would not relieve wounded and suffering enemies of the United States, and of the fact that it had refused to accept a German nurse.

All this evidence upon the collateral issues has received perusal and meditation; but, conceding that the defendant made the statements to which the banker testified in the privacy of his home, and conceding the truth of the testimony of the witnesses for the government upon the various collateral issues, the conclusion is nevertheless irresistibly forced upon our minds that, in view of the established fact that the defendant never by public act or speech engaged in any opposition to any of the endeavors of the government to prosecute the war, but, promptly upon its declaration, from his pulpit instructed his parishioners to discharge their full duty to the nation therein, that by his constant public prayers he continued this influence, that he testified that he had never had any of the evil intents or purposes denounced by the statute, and in view of the fact that the statements in the conversations with the banker in his home were not appropriate to accomplish any such purposes, it is impossible to conclude that there was in this case any substantial evidence to sustain the finding of the jury that he willfully made those statements to interfere with the operation or success of the military or naval forces of the United States, or to cause or attempt to cause insubordination, disloyalty, or refusal of duty therein, or to obstruct, or that he did thereby obstruct, the recruiting or enlistment service of the United States. Those statements were not made where they would or could naturally and reasonably have had any such effect, nor were they indicative of any such intent, nor was any such result the necessary or legitimate consequence thereof.

Let the judgment be reversed, and let the case be remanded to the court below, with directions to discharge the defendant.

CARLAND, Circuit Judge, concurs in the result, upon the ground that the trial court erred in overruling the demurrer to the indictment, but expresses no opinion upon the sufficiency of the evidence.