### NEW v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 15, 1917. Rehearing Denied December 3, 1917.)

#### No. 2948.

1. POST OFFICE ☞35—OFFENSES AGAINST POSTAL LAWS—USE OF MAILS TO DEFRAUD.

The making of pretensions and promises which were false and fraudulent for the purpose of obtaining money and other things of value from others, and the depositing in the post office of letters in pursuance of the fraudulent scheme, were all the essential elements of the offense of using the mails in execution of a scheme to defraud.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. CONSTITUTIONAL LAW ⬅︎84—POST OFFICE ⬅︎35—USE OF MAILS TO DE-
    FRAUD—RELIGIOUS LIBERTY.
    Notwithstanding the provisions of the Constitution of the United States
    securing to every citizen the right of religious freedom, it was a viola-
    tion of the statute forbidding the use of the mails in execution of schemes
    to defraud for defendant to pretend to believe that he had obtained a su-
    pernatural state of self-immortality by righteous conduct, which power
    enabled him to conquer disease, death, poverty, and misery, and could
    be transmitted to others willing to pay therefor, for the false and fraudu-
    lent purpose of securing money and other things of value from third per-
    sons by use of the post office, and to use the post office for such false,
    fraudulent, and illegal purpose.

3. POST OFFICE ⬅︎49—OFFENSES AGAINST POSTAL LAWS—EVIDENCE.
    On a trial for using the mails in the execution of a scheme to defraud,
    letters alleged to have been deposited in the mails in pursuance of such
    scheme were admissible.

4. POST OFFICE ⬅︎49—OFFENSES AGAINST POSTAL LAWS—EVIDENCE.
    In a prosecution for using the mails in execution of a scheme to de-
    fraud through companies, associations, and corporations to be organized
    for the ostensible object of publishing and selling books, printing and
    publishing magazines, educating and instructing eligible persons, and
    conferring upon them supernatural gifts and powers, which defendant
    pretended to believe he had acquired, evidence *held* sufficient to support
    a finding that defendant used the mails as a means of obtaining money
    in pursuance of a grossly fraudulent scheme and with intent to defraud.

In Error to the District Court of the United States for the South-
ern Division of the Northern District of California.

John Fair New was convicted of an offense, and he brings error.
Affirmed.

Reisner & Honey, of San Francisco, Cal., for plaintiff in error.

John W. Preston, U. S. Atty., and Casper A. Ornbaun, Asst. U. S.
Atty., both of San Francisco, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. The plaintiff in error was convicted under
the second, third, and fourth counts of an indictment containing seven
counts, charging him and one Marie T. Leo, alias Maria Tully, alias
Marie Graham, with devising a scheme to defraud, to be executed by
means of the post office establishment of the United States, and that
they in fact did use the mails in such execution. The codefendant
of the plaintiff in error was acquitted as to all of the counts, and he
was acquitted as to counts 1, 5, 6, and 7 under the instruction of the
court; there having been no proof of the depositing in the mails of
the letters respectively alleged in those counts to have been so placed.

In the court below the validity of the indictment was questioned,
both by motion to quash and by demurrer, and here it is strenuously
contended in behalf of the plaintiff in error that it is in legal effect
based on the religious belief of the plaintiff in error, in contravention
of that provision of the Constitution of the United States securing to
every citizen the right of religious freedom.

[1] It alleges various pretensions and promises of the defendant,
New, which are alleged to have been false and fraudulent, and to have

been made for the purpose of obtaining money and other things of value from others, and it alleges that in pursuance of that fraudulent scheme he deposited in the post office certain letters, one of which was set out in each count of the indictment. Those alleged facts are essential elements of the offense denounced by the statute upon which the indictment was based, but all that are essential. Stokes v. United States, 157 U. S. 188, 15 Sup. Ct. 617, 39 L. Ed. 667; United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516; Brooks v. United States, 146 Fed. 223, 76 C. C. A. 581; Miller v. United States, 133 Fed. 337, 66 C. C. A. 399; Stewart v. United States, 119 Fed. 89, 55 C. C. A. 641.

[2] The government in no way sought by the indictment to prevent the defendants from honestly and sincerely entertaining the views the indictment alleges they pretended to entertain, nor from honestly and sincerely endeavoring to persuade others, by any legitimate means, to embrace the same notions. But what the government did undertake to do, and what it had the statutory authority for doing, was to prevent by indictment the defendants thereto from pretending to entertain the views therein specifically alleged for the false and fraudulent purpose of procuring money or other things of value from third parties by use of its post office establishment, of which use the indictment alleges the defendants availed themselves for the said false, fraudulent, and illegal purpose. That is this case, and the whole of it, in so far as concerns the point already mentioned. In such cases, as held by the Circuit Court of Appeals of the Fifth Circuit in the case of Post v. United States, 135 Fed. 1, 67 C. C. A. 569, 70 L. R. A. 989, the question of the defendant's good faith is the cardinal question. See, also, United States v. White (D. C.) 150 Fed. 379, where the pretensions of the defendant to the indictment and the matter sent through the mails, while of the somewhat general nature of those here involved, were insignificant in comparison, and where the court instructed the jury that the point that they were to consider and determine was, not whether it was possible that the things which the defendant promised to do could be possibly done by any one, but whether it had been proven that the defendant did not intend to do what he promised he could and would do. In determining that question, said the court:

"You are entitled to consider and weigh every fact and circumstance which you find to have been proved which in your judgment throws light upon his good faith. The question is: Did he honestly, in good faith, intend to do the things which he promised he could and would do, as the consideration for the money which he proposed to himself to obtain from those with whom he opened up communications through the post office as charged in the indictment?"

[3] That the letters alleged in the indictment to have been deposited in the mails in pursuance of the alleged scheme were admissible in evidence, of course, goes without saying, and that there was sufficient evidence given to justify the jury in finding that those specified in the counts on which the plaintiff in error was convicted were so deposited is, we think, equally clear. Their character is of no consequence. United States v. Young, 232 U. S. 155, 161, 34 Sup. Ct. 303, 58 L. Ed.

548; United States v. Kenofskey, 243 U. S. 440, 37 Sup. Ct. 438, 61 L. Ed. 836.

[4] It is, however, further contended on behalf of the plaintiff in error that the trial court should have directed a verdict in favor of the plaintiff in error on the ground that there was no evidence tending to show that he formed any scheme or artifice to defraud, which point calls for a brief statement of what constituted the alleged scheme, and for some reference to some of the testimony introduced tending to show the commission by the plaintiff in error of the alleged offenses.

Except as to the letters alleged to have been deposited by the plaintiff in error in the mails, the three counts under which he was convicted are, in substance, the same, and alleged that he and his codefendant at a certain specified time and place, within the jurisdiction of the court below, devised a scheme and artifice to defraud various persons and the public generally, and particularly certain specifically named persons, termed in the indictment "victims," and divers other persons to the grand jurors unknown, which scheme and artifice was to be effected by means of the post office establishment of the United States, and was, in substance, as follows:

That the defendants would pretend that New was a human being who had attained the supernatural state of self-immortality in the body, by a course of righteous conduct consisting in abstinence from the use of meats of any kind as food; abstinence from the use of intoxicating liquors of any kind; abstinence from the use of indecent or profane language of any kind; abstinence from telling falsehoods and bearing false witness against his neighbors; and, lastly, by abstinence from the sin of committing adultery by acts committed, evil desires, or lustful eyes, or otherwise. That such supernatural power had enabled him to conquer disease, death, poverty, and misery. That this power could be transmitted by him to others who were willing to accept his teachings and pay therefor the sums demanded by him. That the defendants would likewise pretend that New was of divine origin and birth, a son of the Holy Ghost, greater in authority, majesty, and power than was Moses, Elijah, or John the Baptist; yes, that the mantle of the "Man Galilea" had fallen upon him, and he had received the "keys of the kingdom of Heaven." That each and every of such pretensions would be false and untrue, and known by the defendants and each of them so to be, and that New had no supernatural power or authority of any kind or character, but was an impostor, an heretic, a seeker of vainglory, a covetor of his neighbor's goods and his neighbor's wife, and was also an habitual indulger in each and every of the sins and practices he pretended to condemn. That the defendants, in order to obtain money and other things of value from the said victims, would pretend that New was the author of a large number of books, to wit, 100, then published, treating of the said supernatural gifts and power, and its transmission to others, the said New not being the author of but one book, as the defendant well knew, and that volume consisting only of a small compilation of platitudes and garbled extracts from other works. That he would organize in various cities of the United States, companies, associations, and corporations

of various kinds, with the ostensible object of publishing and selling said 100 books, and of printing and publishing magazines, educating and instructing eligible persons and conferring upon them said supernatural gifts and powers, the defendants intending thereby to appropriate to their own use the sum or sums so invested, well knowing that no books of any kind other than the said one volume was being published, or was to be published by the defendants, and well knowing that no magazine was being published, or was to be published, by the defendants, and also then and there well knowing that it was not the intent of said defendants or either of them to publish any books or any magazine, or give anything of value for said money so invested, the true intent of said defendants being to appropriate to their own private use all moneys received, and, when said fraudulent acts became known, to remove themselves to another city of the United States and organize similar concerns and corporations and make the same false pretensions, under the name of different corporations or associations, and using assumed and fictitious names for themselves for such purpose. That likewise it was a part of said scheme that defendants should advertise and claim that they had organized, according to law, and were so conducting an educational university which had for its object the instruction and graduation of eligible persons applying, in the said art and power of supernatural healing and teaching, and that defendants should advertise that 70 free scholarships had been endowed by a man of great wealth, and that those getting said scholarships would pay only $10 for enrollment, and $5 more on graduation, and that those students not possessing said scholarships would have to pay $100 extra—the true intent and purpose of the defendants being, as they then and there well knew, to induce as many enrollments at $10 each as they could get, and that the victims might be thus induced to believe that a bargain or exceptional opportunity was being offered them to graduate and receive a lawful degree from said university, and might also be induced to invest money in said university in exchange for an alleged position or office therein, the defendants further then and there well knowing that no scholarships of any kind were endowed, and that it was not their intention to limit the issue of said scholarships to 70, or to any other number, and further then and there well knowing that no efficacy or power was lodged in said teachings or said alleged university, and further well knowing that the said victims were to receive and would receive nothing of value for the money so invested by them. That it was likewise a part of said scheme that said defendants should make a false and fraudulent application of sections 602 and 602a of the Civil Code of the state of California relating to the creation of corporations sole out of religious societies in this:

That defendants should pretend and claim, for the purpose of inducing the said victims to invest money in said corporations and associations, and subscribe for said magazines, and take and pay for said scholarships, and purchase said book, that the Newthot Church was a national organization, consisting of many branches situated in various parts of the world, and that pursuant to the regular adoption of rules and regulations a Newthot Congress had been duly called and

held in San Francisco, in the state of California, and that the defendant New, under the name and guise of Newo Newi New, had been elected Head Bishop or Archbishop of said Newthot Church for life, with the power of transmission by will or otherwise, to his successor, of the powers so conferred, and that among said powers so conferred on said Head Bishop was the power to bestow the titles of healer, pastor, and bishop upon the graduates of said alleged university, and the investors in said corporations or associations, and the subscribers to said magazines, and the purchasers of said scholarships and said books; that to that end the defendants should cause to be filed with the county clerk of the city and county of San Francisco, state of California, an affidavit required by said sections 602 and 602a of the Civil Code of the state of California, showing that the defendant New has been regularly elected to said office of Head Bishop; that a position of pastor, healer, or teacher in said Newthot Church should be promised to the said victims in order to induce them to invest their money in the various branches of said scheme, the defendants then and there well knowing that the Newthot Church, with which the defendants claimed to be identified, had no existence at any time or place, national or otherwise, and that no Newthot Congress had been called or held, and that no machinery existed whereby such a Congress could be called or held, that no material existed from which to convene such a Congress, and that said affidavit would be false and untrue, the true intent and object of the defendants being to falsely and fraudulently assume and claim and pretend that the defendant New had attained power and authority to which he was, as defendants well knew, not entitled, and in fact did not possess, in order to obtain money and other things of value from said victims in connection with the matters alleged; that in furtherance of said scheme and artifice to defraud, to be effected as alleged, the defendants did, at San Francisco, in the state and Northern district of California, on a specified day, willfully, unlawfully, knowingly, fraudulently, and feloniously deposit in the post office establishment of the United States a certain envelope upon which the postage was fully prepaid, which said envelope was addressed in a designated way—that set out in count 2 being addressed to Mr. Henry H. Doolittle, 511 So. Olive St., Los Angeles, Cal., and which envelope, so addressed, stamped, and deposited, contained a letter in words and figures as follows, to wit:

"Mr. Henry H. Doolittle, 511 So. Olive St., Los Angeles, Cal.—My Dear Brother: We are in receipt of your valued favor of recent date and thank you very much for your cordial and fraternal words of welcome.

"In answer to your question would say, that we have a fine copy of our three dollar book on the Newthot Science. This is the revised edition of the book we wrote you in regard to some time ago, the price of which was two dollars. This book is handsomely bound in cloth and stamped in gold and sells for three dollars, but, if you wish us to send it to you, you may send along the two dollars, and we will at once send it to you prepaid and call it square, as we are desirous of having you own a copy of this book, which we feel that you will enjoy immensely.

"With the hope of hearing from you soon, I remain, my dear brother and friend, always,

"Faithfully thine in truth, love and peace.

"[Signed] N. N. New (Bishop).

"The Newthot Temple, Inc., Palace of Education, P. P. I. E., San Francisco, Calif."

Regarding the contention on the part of the plaintiff in error that the evidence did not tend to show that the alleged scheme was fraudulent, it will be sufficient to make but a few references to the voluminous record, from which it appears that the plaintiff in error commenced his operations in the East and in New York, undertook the sale of a book called "New Life Theology, the New Life Science," written by his father, but from the front of which he removed a page and inserted in the place of it a photograph of himself; that in New York he also organized a corporation called the "New Life Publishing Company," for the ostensible purpose of publishing a large number of books—about 50—of which he claimed to be the author, and from the sale of the stock of which corporation he obtained from various persons various sums of money, and the use, at least, of some furniture. The witness Florence K. White gives this account of some of the operations of the plaintiff in error there:

"I first met Dr. New at the Broadway Central Hotel about the middle of September, 1910, through an introduction by Mrs. Anna Louise Johnson, who was a friend of mine, who was in New York trying to publish a book of hers called "New Dawn." Dr. New told me that he had a business that he wanted to formulate in the way of editing a book or a magazine, and that he wanted to promote the New Life Publishing Company; he wanted to organize it and to incorporate it. He asked me if I would like to join them, and I then asked him questions regarding the business and what would be necessary for me to do to go into the work. I asked him what he had to back the incorporation. I said: 'If it is a new thing, I do not care to go into it, for I have no money to lose.' He said there was no chance of losing any money, for it was an old established business. He said he had from his mother's estate $50,000 and from his father's estate $60,000 that he had already invested. I said, 'Have you a church established in New York?' and he said he had, with a membership of 800 people. He also told me that he had spent all his life in the work and had spent more than the money his parents gave him for the promulgation of the work. I asked him who he had for workers at that time, and he said, 'I have not got established yet;' but Mrs. Stetson is a lady who is going to raise the finances for the mother church. He said, 'Mrs. Stetson has already put in $1,500.' I said I did not care to go into anything that I have got to put money into, unless I am pretty sure that it is an established business; then he said to me, 'This will be a success.' He also told me he had Mr. Leech, a gentleman from Ohio, who would also put in $1,500, and if Mr. Leech found it necessary he was going to have several of his friends in his native city also invest $1,000 apiece, and there were three or four of them. He also told me that they had an apartment in one of the wealthy portions of New York City, 65 Central Park West; that they had secured that apartment for the home of the New Life Association, therefore he would like to have me go and look at this apartment with Mrs. Johnson. That was on the first day that I met him. I went up and looked at the apartment a day or two after this. He said that they wanted to take the apartment, and that there was $25 paid on it, which Mrs. Johnson had paid, and he would have to have it by the 1st of October, and he was very anxious to have me take hold of the proposition at once, which I did. I invested altogether $1,000. I also put in furniture that I had stored in Boston; I told him that I had furniture over there; I was really going to Boston to visit my people, and I stopped in New York to visit some friends there. I asked Dr. New what inducements he would give me; that I could not afford to give my services for nothing; and he said, 'Well, I guess we will start you out for $35 a week,' I to have a room in the New home and to come and go to work whenever I saw fit to do so. I asked him how much money he wanted from me at first, and he asked me how much I wanted to put in; and I said, 'I don't know as I want to put in much, if any,' for I had no money to lose,

and he said, 'Well, if you can let us have $1,000, I will accept that.' I had $500 in cash, which I gave him. For the $1,000 I got 200 shares of stock, valued at $5 a share. Mrs. Johnson and myself went to that house and worked there about two weeks before it was finished, and then he came into the house, and after he was in the house about a week or so, he brought me this book, and said it was for the money that I had given him. Then he asked me what I was going to do with the furniture that I had moved there. My furniture was worth about $1,200; and he says, 'Are you going to put it into the society?' And I said, 'I certainly am not until you make good and show me what you are going to do with the society.' Mrs. Johnson and myself first went there, and Mr. New and Mr. Leech came up there. Mr. Leech occupied one of the rooms. After he had been there a few days, Dr. New said that there would be no other people in the house but Mrs. Johnson, who would be one of the teachers, and Mr. Leech and myself and himself, and he was to get a maid to do the housekeeping. One day he came home and said: 'There are a couple of ladies coming to the house, old friends of mine, and the younger lady is going to be the housekeeper; she will take charge of the house; she is not a common housekeeper, and I do not want you to treat her as such.' However, she took care of the house; she and her mother were there. I knew her by the name of Marie Tully. I was introduced to her as that. While I was stopped at this place, we all had our meals there together. I paid for the meals a part of the time, and the rest of the time I don't know as to whether the bills have been paid. We had everything there was good to eat, as far as that went; we had meat of all kinds, vegetables, fruit, and so forth. The second day we were at dinner we had, I remember perfectly well, beefsteak. Every time Dr. New was at the table with me he ate meat; we had meat every day, twice a day. As to eating meat he said: 'We preach that we do not eat meat to the outside world; but we can have what we like at our own private table.'

"I heard a conversation between Mrs. Johnson and Dr. New with reference to money invested in the company by her. Mrs. Johnson said that she did not care to take stock and give her writing for it—her 'New Dawn' writing, which he wanted to put into the company as his own work. Mrs. Johnson was a dramatic writer by profession; she had a manuscript for a work called 'New Dawn.' Dr. New said that he would like to have the 'New Dawn'; that he might put it into his work and have it come out as his work; and I said, 'Dr. New, how could you dare to do such a thing, when you know that Mrs. Johnson is the author of it, and everybody else knows it.' He said to me, 'What business is it of yours?' After I had stopped at these apartments awhile, I went to Philadelphia; Mrs. Johnson left the apartment with me. She got her manuscript. I know she invested something in the concern, but I don't know how much. I heard a conversation between her and Dr. New with reference to the money she invested in the corporation. The last meeting that we had we were told by Dr. New that we must get out; this was the second month; he asked me to try and raise the money, which was $125, to pay the second month's house rent. He called a meeting of Mr. Leech, Mrs. Johnson, and myself, and Mrs. Stetson and Miss Tully were present, to see if we could not raise more money to carry us over the holidays, to pay the second month's rent, and I said, 'Where is the money that we put into it?' and he said, 'It has been spent.' I said: 'The furniture is all paid for; why can't we raise $200 or $300 on the furniture until after the holidays, and then Mr. Leech's friends would be coming forth with their money?' And he said, 'We can't do that, for the furniture is already mortgaged.' I said, 'How is that?' He said, 'Well, I mortgaged it for $500 to Miss Tully.' The money that I invested in the corporation for this stock went to the treasurer, who was Dr. New. I don't know what he spent it for; I never saw it in his books or anything; he always took the money and took care of it; we never saw it again. He told me that he had spent part of this money in incorporating, $150, the New Life Publishing Company. The purpose of that corporation was to publish 49 books. The capital stock of the corporation was $100,000, and the stock was to be sold at $5 a share. Mr. Leech was to be the promoter. I can identify this New Life Theology or New Life Science.

He said he got $5 for that book. He told me that he had the manuscript for 49 more, but I never saw any of the manuscripts. He said he was the author of this book. I asked him for the manuscripts of the other 49 books, and he said that he would show them to me some time; but I never saw them. The incorporation only lasted two months. During the time I was with him he never published any books. In regard to the last meeting we had to raise money for the furtherance of the incorporation, he asked us all if we could raise more money for him, and he took me into his private office and he said, 'Mrs. White, you say that you know a good many rich people in the city; can't you get some of your friends to put some money into this?' and I said, 'Certainly not; I certainly cannot do it.' Then we had our meeting and he asked us all to resign; after we said we would not raise any money, he said, 'Well, it is up to me to raise the money; I have some more friends down town, wealthy gentlemen, whom I have seen, and they have said that they would come into this corporation and spend $5,000 apiece the first of the week.' He said, 'I have got it so that they will come in the first of the week.' He said, 'But you will have to resign; you people who hold positions will have to resign.' I was one of the directors, and so I said, 'Well, I am willing to resign or do anything to further the cause of the company;' and Mr. Leech said he was, and Mrs. Johnson also resigned. We resigned that night, and he went down town. I didn't see anything of him until the following Monday morning; that was Saturday night. He had given instructions that Mrs. Johnson and I should give up our rooms that day, as these gentlemen were coming to occupy the rooms. I got very angry and I told him—I asked him what he meant by telling us to get out. We got out that week, and I said, 'What are you going to do with Mrs. Johnson, when you have taken every dollar from her?' This statement was made Monday morning. I said, 'What are you going to do with Mrs. Johnson, when she has not a dollar in the world, and only has what little I can give her?' and he said, 'I have not got any money either.' I said, 'Are you going to turn the poor old woman out into the street in the winter time, without a dollar or a place to go, or anything to eat?' and he shrugged his shoulder, and he said, 'I can't look out for Mrs. Johnson any further.' Then he said, 'She can go down to the Broadway Central," where he had these rooms; he had not given those up until the first of the year. So the arrangement was made that Mrs. Johnson should go down there and occupy these rooms until the 1st of the year. Mrs. Johnson had nothing to eat, only what Mrs. Stetson and myself furnished her while she was there.

"Mrs. Stetson and Mr. Leech were officers of the corporation with Dr. New. Afterwards, when I called on Dr. New and asked him if he had got these four men with their $5,000, he said, 'No; it slipped up,' as it always did. Then he asked me if I would not like to buy out the apartment and run the business, and I said, 'No; I had nothing to buy it out with.' When I said I would not give the furniture to the corporation, he said, 'What will you do with it?' and I said, 'The only thing I can do with it is to lend it to the corporation, say for a year, and by that time we will know whether we want to work together or not;' so it was agreed upon that way, and I left my furniture at his house—at the apartment. And after that I went to Philadelphia, and he remained in the apartment until about the last of January, and I received word to come and get my furniture, that they were breaking up, and when I arrived at the apartment everything was taken out of the apartment but my things, and I asked him for the furniture, and he said that he would deliver the furniture to me, but that I would have to sign a paper to get relief from this, and I said, 'I have signed the last paper that I am going to sign for him;' and he said, 'You will not,' and an oath, 'take a thing out of this house until you have signed that paper.' He used the oath at that time, 'damn'; I have heard him say 'damn' on several occasions. I saw them at least three times after I left the house, and Miss Tully and her mother and Mr. New were occupying the house. He said that he had written 49 books at that time. He said, as to his age, that he was 79 years young. He told Mrs. Johnson that she ought to say that she was 150, she was so well preserved; her hair was very white; she had a very fair complexion; she was a woman about, I

should judge, 70. Dr. New told her that; he was speaking of ages one day, and he said that. I don't know what his true name is. I asked him what his name was one day, and he said, 'John Fair New.' He said Fair was his mother's name. This edition of the books that I saw was the same as the one I have looked at there, that had already been published. There was a supply of them on hand. It has this frontispiece in it. I have seen that letter that they used, like that (Exhibit 12). At the time I was identified with this institution a book called New Life was being put on the market. He said he wanted to edit a magazine, or publish a magazine. At that time he was circulating such literature as this; there was a supply of this on hand. At the time that I put money into this concern, I got the individual stock of Dr. New. He said so much stock was issued to him for so many volumes of books. I think Dr. New was supposed to own $25,000 of the capital stock of the corporation, from what he said to me. John Fair New was the president of this corporation. There was no effort made by him to publish any book while I was there. He spent most of his time going up and down town; I don't know what he did down town, of course, but he would come in, and while he was around the house he was trying to plan to do something, that is, in the way of getting his company going, and as time went on I said, 'We are losing time here; aren't we going to do anything?' and he said, 'Well, we must get a large theater for me to lecture in on New Life movement.' I went around several times looking for a theater that would suit him, and nothing seemed to be good enough for him. He spent a good deal of his time in the house talking about the work. When Miss Tully and her mother came into the house they brought their trunks. I smelled liquor on his breath at the time that I went to get my furniture from him; that was in January. I couldn't say that I smelled liquor on his breath more than once, but I did that time, I am quite sure. He said he visted the clubs around New York City; that he was going to meet some of his friends there on several occasions. For the $5,000 these men were to put in he was going to sell this stock; there was nothing else to sell; there was nothing absolutely to back him in this corporation that I ever saw. As to this $110,000 he had received from his parents, he told me that he had done a great deal of traveling; he had traveled all over the world in the promoting of this work. When I went into the work, he impressed on me very forcibly that he had the business established, or I would not have put my money into it. While I was associated with the work, nobody was healed. He could not even heal himself."

From one of the publications of the plaintiff in error—and, according to the contention of the government's attorney, the only one he did publish—the "Newthot Science," we extract the following clauses:

"*Original Thinker.*—Twenty thousand years ago, possibly longer, during the Golden Age, before the Fall of man, when all men lived by the Newological Law of Correspondence and held direct communication with God, the Newologist sat in the solitude of the mountain, desert, forest and plain, in the profoundest abstraction, endeavoring to think out the Newological problem of human existence. Aristotle, Berkeley, Comte, Hegel, Kant, Plato, Socrates and others, adown the centuries, have been seeking a solution to the problem of immortality in the body. Akin to the ancient seers, isolating himself from the world, seeking silence and solitude, surcease from busy humanity, Newology has its studious sage, its wanderer thru the field of thot, its searcher for an endless life. And so our Great Newologist, quietly seated in mental abstraction so profound that for years he was unconscious of all physical environment, even oblivious to heat and cold, rain and storm, noise and confusion, sleep and exercise, hunger and thirst, until at last in the most glorious moment of his life, he discovered Newology by which he is now to redeem humanity from all the ills of the past. * * *

"*Blonde Hercules.*—The author belongs to a class by himself. Physically he is a blonde Hercules, with square massive shoulders, huge arms and legs, smooth-shaven face, almost boyish in general aspect. His eyes are a keen gray, overtopped with blonde silken eyebrows. His attire is usually a com-

plete suit of white broadcloth, including frock coat and well-creased trousers. He greets you with a smile. He is opposed to everything that savors of death. He would revise every dictionary and cast from their pages every word symbolical of the ending of life. The words ancient, old, dead, dying, fading, sorrow and pain should never be spoken, and to the mouths of Newologists such utterances are tabooed. Talk of prolonging life. Think of living forever. Believe that you will exist perpetually. Get ready to live forever."

From New York, according to the record, the plaintiff in error went to Seattle and from there to Los Angeles, in both of which cities he appears to have organized like publishing companies, and in the latter city addressed to one of his female associates the following letter:

"Hollenbeck Hotel,

"Los Angeles, Cal., Friday, P. M.

"Dear Dr. Claire: Your welcome letter recd. Am very glad to hear from you. Now sister if any one calls, man or woman, to ask about the Book Company, Church or the University, be sure and always have and tell a prosperous financial business story as I have referred some parties there or rather gave them the street and number and said their friends (who live there) could call there at our offices and see the progress for themselves. I am writing to Marie the same. I gave her name as V. Pres. and yours as Sec. and local Pastor, so be ready both of you at all times to tell the fine condition of the business generally. This is very important so talk it over with Marie and be ready. Always easy and never embarrassed in the least and always most prosperous.

"Also we are to have the New Auditorium for the Newthot World Congress etc. I will tell Marie to see you and talk it over so as to be ready. Read her this letter and remember your offices, etc. May God bless you both and helpt and keep you. Bye and Bye.                                    N.

"Also many students all over the world, etc. etc. etc. etc. It is the Newthot Co.'s doing business now there. See. Large sales of books, etc. etc. etc."

In Los Angeles the witness Julia Etta Marston, according to her testimony, had the following experiences with the plaintiff in error:

"I first met Dr. New on the 10th of June, 1914. In regard to my first meeting the doctor, there was an article in the Times telling of the work and what it meant; he believed in immortality in the physical body, and I believed that since 1890, when I was given up by physicians to die. I had believed that, and when I read this in the paper, I had never found any religious organization that had attained that knowledge, and when I would talk about it they thought I was crazy. After reading that article, I wrote up to him for some literature, and he sent it to me; after reading the literature, I sent for a bible, and he sent it to me; I sent $2.50, and I got one with a paper cover, and I read it, and then I took the course; I sent an application and took the course through the mail; I took this course, and if I made 90 I would not have to take but one course, but if I did not I would have to take the two; my first work was 92½ and the next 94½; then after I had gotten that far along, my duties were such in Los Angeles that I could not take any more through the mails, and I wrote to him I would have to give it up; so he said he would come down and give me personal lessons, which he did, which lasted about a week, from the 14th of June until the 18th of June, and then he came back in July and I finished my lessons, and he brought my diploma with him; that is how I met Dr. New. It was of my own seeking. I got a diploma. It is in my trunk. I could have brought it, if I had known you wanted it. I cannot identify these as circulars that he sent through the mail. He had two little ones; one is in regard to the university. It stated it was $10 for application and $110 for a scholarship; as he had come down and incurred expense, I paid him $100 when I got my lessons through. I took the regular course and paid for it. I paid him $100; I paid him $10 when I

sent the application, and when I completed and got my diploma I gave him $100. When he came to give me personal lessons, the lessons consisted of asking me Bible questions and I would answer them, and I also had to lecture before him. When I was lecturing, he simply sat and listened. Once when I was lecturing, I remember that he went to sleep. He said: 'Sister, does it matter if I close my eyes? I can hear you.' And I said, 'No.' After awhile he was shaking his shoulders and laughing, after I got through, and I said 'What is the matter?' And he says: 'Well, it is too good to keep. I slept fifteen minutes, and waked up, and you were going on just the same.' As to my being prepared to take up the advanced work, he said that I was the best qualified, and one of the best Bible students he had ever met."

When the plaintiff in error reached San Francisco in his movements, he appears to have organized four corporations, namely, "The Newthot Publishers," "The Newthot University," "The Newthot Church," and "The New Order," stock of which companies he proceeded to sell. One of the paragraphs of the articles of incorporation of "The Newthot Publishers" reads as follows:

"The names of those who have subscribed money or property to assist in founding the Newthot University, together with the amount of money and description of property subscribed, as follows, namely, to wit:

Dr. Newi Newo New, Publisher Newthot Church................$990,000
Dr. M. L. Claire, Pastor Newthot Church...................... 10,000"

If the plaintiff in error paid in any portion of the $990,000 so subscribed, we find no evidence of the fact in the record. It further appears from the record that the plaintiff in error was carrying on his operations on the fair grounds of the World's Fair of 1915, and that he was arrested at his apartment by deputy marshals about half past 6 o'clock in the morning of the 1st of October under circumstances thus detailed by the witness Crowley, whose testimony is corroborated by that of the officers:

"I was out at the apartment of Dr. New the morning that he was arrested, about half past 6 in the morning, October 1st, last year. Mr. Jessen, Mr. Bohn, and Mr. Conlan, deputy United States marshals, were there. I saw an entrance effected into the apartment. Mr. Bohn knocked on the door, and he knocked several times, and a lady's voice answered, and he asked if Dr. New was in there, and the woman replied, 'No.' Then he said, 'You will have to let me in.' She said, 'You can't come in here.' Mr. Bohn said, 'You had better open the door, because we are coming through anyway.' So in the course of a few minutes the lady opened the door. I saw Dr. New in there; he was in bed in the front room, known as a wall bed. He had some of his street clothes on; he was in his underwear. The bed was directly in front of the door. It was mussed up; I could not say as to whether it had been occupied by more than one person. Mrs. Graham had on a kimono. I saw some lady's apparel in Dr. New's room. Some of it was on that window seat, and part of it was on the chair in front of the bed. I don't know that I could describe the wearing apparel. The best way to describe them would be to say a lady's lingerie; that is, stockings, corset, and the rest of the lingerie. I was there in the capacity of the newspaper reporter. I was detailed by my city editor to go there. There was false hair lying on the dresser; there was what is known as a switch lying on the dresser."

We think enough has been stated to show that the plaintiff in error was not the immaculate personage he pretended to be, and that the jury was entirely right in finding in effect that he used the mails of

the government as a means of obtaining money of others in pursuance of the grossly fraudulent scheme devised by him as alleged in the indictment and with the intent therein specified.

The judgment is affirmed.