**UNITED STATES v. KORNER.**
Civil Action No. 2578–PH.

District Court, S. D. California, Central Division.

June 13, 1944.

Charles H. Carr, U. S. Atty., successor to Leo V. Silverstein and John Marvin Dean, Asst. U.S. Atty., all of Los Angeles, Cal., for plaintiff.

Ames Peterson, of Los Angeles, Cal., for defendant.

A. L. Wirin and Nathan Newby, both of Los Angeles, Cal., amici curiae, by appointment of the Court.*

HALL, District Judge.

A copy of the Memorandum this day filed in United States v. Kusche, D.C., 56 F.Supp. 201, is filed herewith and made a part hereof.

The statements in the complaint concerning the objects and purposes of the Bund, the defendant's knowledge of it, etc., are identical with the statement contained in the complaint in the Kusche case on the same matters.

There is one divergence: In the Kusche case it was alleged that the defendant joined the Bund four years after he obtained his citizenship; whereas, the defendant in this case is alleged to have joined the Bund before he took his citizenship papers.

In that connection, it appears from the face of the complaint that the defendant joined the Bund in 1933, and was a member of the Bund during the entire five year period previous to his naturalization on August 12, 1938, and continued as a member of the Bund until the next year.

The query is whether or not such membership during the five year period requires a different answer than in the Kusche case to the five objections made on behalf of this defendant. Those objections are the same as in the Kusche case and are set out in full in the memorandum in that case and are not here repeated.

The *First* Objection as to laches must be and is answered against the defendant as it is in the *Kusche* case.

The *Second* Objection, that the Hitler Government was a new "State" and did not come into existence until after defendant took his oath of allegiance, is not applicable for the reason that the defendant was naturalized in the instant case in 1938, long after the Hitler Government came to power in Germany.

As to the *Third* and *Fourth* objections:

■ As will be observed from the Memorandum of Opinion filed in the Kusche case, it is my conclusion that the judgment of admission is res judicata as to the applicant's attachment and allegiance, and cannot be set aside on the ground of "illegal procurement," and that such judgment can be set aside only on the ground of extrinsic fraud.

■ The question as to the *Third* and *Fourth* objections then resolves itself into determining whether or not the complaint states a cause of action for extrinsic fraud, by virtue of the allegations in it that the defendant was a member of the Bund during the five year period. In my opinion it does not.

■ The requirements for stating a cause of action for extrinsic fraud as to attachment and allegiance in a de-naturalization case, and the authorities supporting those requirements, are set forth at length in the Memorandum in the Kusche case. In addition to those authorities, there has just come to hand the Opinion of the Supreme Court, in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 64 S.Ct. 997, wherein the Court, while holding that the Circuit Court has sufficient power over its own judgments to set one of them aside after the expiration of the term and without an independent suit in equity, nevertheless affirmed the proposition that the fraud required as a basis for setting aside a judgment must be extrinsic fraud, historically recognized by courts of equity as the kind of fraud necessary to vitiate judgments.

The Court said, 64 S.Ct. at page 1001:

"Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. *This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here,* even if we consider nothing but Hartford's sworn admissions, *we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.*" (Emphasis supplied)

From that Opinion it appears that there

* At the commencement of the trials, several of the defendants were without counsel, and stated that they were unable to employ counsel. Before proceeding further the Court appointed Mr. A. L. Wirin to act as amicus curiae to represent the rights of the defendants who were unrepresented. During the course of the trials, each defendant subsequently secured his own private counsel, but at the request of the Court Mr. Wirin and Mr. Newby submitted briefs and argued the general questions involved.

was diligence in bringing the proceeding to cancel the judgment after the discovery of the fraud, as the discovery was made in 1941, and the proceeding was commenced in 1941. It also appears that there was diligence in the efforts to uncover the fraud, as within less than 10 days after the original Opinion of the Circuit Court the Hazel Company started an investigation, which, however, was fruitless. The Supreme Court held nevertheless that the fraud was so gross that the showing of diligence to uncover it was unnecessary to relief.

The complaint in the instant case meets none of the minimum tests for ascertaining whether or not a complaint states a cause of action for setting aside a judgment on the ground of extrinsic fraud, as those tests are laid down in the authorities cited in the Memorandum in the Kusche case, and as those tests are affirmed in the Hazel-Atlas case, supra, just decided by the Supreme Court.

Without excluding the rest of the things said in the Kusche case, or expressing the following as a limitation of what may be required to state a cause of action for extrinsic fraud, let it be said, that here, as in the Kusche case: "There is no allegation that, although given repeated opportunity by the law, the plaintiff ever made an inquiry, before the judgment of naturalization, as to whether or not defendant believed in national socialism, as to what organizations he belonged to, as to whether or not he belonged to any organizations, political or otherwise, and there is no allegation that he did not voluntarily disclose these things; there is no allegation that the defendant had been informed in any citizen-training program conducted under the general auspices of, or in any text book published by, the plaintiff or that he otherwise knew, that he could not entertain or express certain political beliefs, and still be attached to the Constitution of the United States. Indeed, it is presumed that the defendant had been informed by the plaintiff or otherwise, and that he knew, that the first amendment to the Constitution provided that, 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble.'

"The plaintiff's attachment to the principles of the Constitution of the United States was proved by the testimony of two credible citizens of the United States, if the statute was followed, and it must be presumed it was, there being no allegation to the contrary. But there is no allegation that those two citizen witnesses or either of them swore falsely about his attachment or his behavior or anything at all. Indeed, not the slightest inkling is given as to what those two witnesses testified to at all.

"Can it be that the alien is guilty of fraud as to what his thoughts and beliefs are, because he did not disclose (if he did not disclose) them to an examiner voluntarily? He had been repeatedly asked if he was an anarchist, or a polygamist, or believed in assaulting or killing officials of this or other governments, or believed in overthrowing this government by force and violence. Must he then in addition to that disclose to the naturalization officials, voluntarily, his opinions and beliefs on the entire gamut of *actual and possible* political views? Must he voluntarily run the political scale to the designated examiner from the simple form of organized government of aboriginal tribes to the most controversial of modern political organizations? Where should he begin? And where should he stop his expression of political beliefs with the Naturalization examiners? He had been taught the principles of the Constitution. He had been taught what was proper for the peace, good order and happiness of the United States, and what allegiance was, under the auspices of the Naturalization Service if they obeyed the commands of the law. And there is no allegation or even intimation that they did not comply with the statute. Was not the alien entitled to believe that these teachings comprehended the full scope of attachment and allegiance, and if he agreed with them to so indicate, without further elaboration of his political or racial beliefs? * * *

"There is no allegation that the defendant did any single thing to conceal his membership in these organizations, or that his membership was secret, or that the purposes, objects and activities of the organization were not known to the plaintiff or were secret; or that there was any secrecy about them at all; or that the defendant attempted to conceal his membership; or that the organization attempted to conceal its existence and activities.

"The complaint contains no allegation as to when plaintiff discovered that defendant belonged to those organizations; nor of what action the plaintiff took to discover

defendant's membership, or his beliefs; there is nothing said to show that the Government acted with reasonable diligence, or any diligence, after making the discovery of membership and purposes.

"There is no allegation of any duress, menace, or undue influence of any kind by the defendant upon the government or any of its officers or agents in the procurement of his citizenship, or of any negligence, disability, wrongdoing, fraud or failure of duty on the part of any such officers."

For the foregoing reasons the *Third* and *Fourth* Objections of the defendant must be and are sustained. The complaint does not state facts sufficient to constitute a cause of action for fraud under the Act, i. e., extrinsic fraud.

As to the *Fifth* Objection: It is to the effect that the conduct ascribed to the defendant by the complaint was an exercise of the right of freedom of *thought, freedom of speech and freedom of* assembly, guaranteed by the First Amendment to the Constitution of the United States.

In the Kusche case it did not seem to me that this question was properly raised because no conduct of the defendant was shown for the preliminary five year period. But here there is the allegation of conduct—membership in the Bund—during the five year period prior to the judgment of naturalization, and the question is properly raised and must be disposed of.

And while the complaint does not state a cause of action for either "fraud" or "illegal procurement," under the tests set out in the Memo in the Kusche case, I must, as a trial Judge, consider and decide the question on this objection in this case because the parties have raised it and are entitled to have it decided.

It is the defendant's position that without regard to whether or not such conduct might be classed as "fraud" or "illegal procurement," he is clothed with the protection of the First Amendment in the conduct alleged.

The question, as stated, is a very broad one, but the consideration and decision of it must be narrowed to its application in this (Korner) particular case.

In this connection several things must be kept in mind:

(A) That no assault is made upon the constitutionality of the Act, but rather upon the effort of the Government by the allegations in the complaint to bring within the terms of the Act, conduct which the defendant claims is his constitutional right; or stated another way, the law itself being constitutional, the defendant asserts the acts of the Government in attempting to enforce the law are unconstitutional; that is, that to sustain the Government's position would be an unconstitutional application of a constitutional law.

(B) That the decision cannot go beyond the situation of the defendant; that is, that the defendant is a person eligible to citizenship, was lawfully in the country, resided for five years in the United States, during which time he "behaved as a person of good moral character attached to the principles of the Constitution, and well disposed to the good order and happiness of the United States," and that the defendant is not an anarchist, a political assassin, nor a polygamist, and that he took the oath of allegiance prescribed by the Act and otherwise complied with all the "preliminary jurisdictional prerequisites" and that a judgment of admission based upon findings of the defendant's attachment, good moral character, and residence for five years, was duly made.

(C) That the objection is being considered at this point only with reference to the sufficiency of the complaint, i.e., whether or not the facts stated are sufficient to constitute a cause of action in light of the rights preserved to individuals by the First Amendment.

Thus limited, the question for determination is narrowed down to a determination of what the essential requirements are in a pleading which seeks a judgment, the effect of which would be to deprive the defendant in the situation as outlined above in "(B)" of liberty of thought, speech, and assembly on political matters, during his five year probationary period prior to naturalization, and during which five year period this country was not at war.

The first proposition for consideration in such question is whether or not an alien under such circumstances has any different or less rights to liberty of thought, speech and assembly under the First Amendment, than a citizen.

It must be regarded as settled that each liberty specified in the First Amendment of the Constitution is a liberty which is secured by the due process clause of the Fifth Amendment to all persons without

regard to citizenship. If that proposition was not settled as to constitutional rights generally by Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Nishimura Ekiu v. United States, 142 U.S. 651–659, 12 S.Ct. 336, 35 L.Ed. 1146; The Japanese Immigrant Case (Yamataya v. Fisher), 189 U.S. 86-100, 23 S.Ct. 611, 47 L.Ed. 721; Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473; and United States v. Pink, 315 U.S. 203–228, 62 S.Ct. 552, 86 L.Ed. 796; and specifically as to the First Amendment by Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L. Ed. 1138; Whitney v. People of State of California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095; Fiske v. State of Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108; Stromberg v. People of State of California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484; Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 946; and Bridges v. State of California, 314 U.S. 252,[1] 62 S.Ct. 190, 86 L.Ed. 192; then certainly it must be considered as settled by the Schneiderman case, Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, where the Supreme Court held that a construction of the Naturalization Act would be favored which would preserve "for novitiates as well as citizens the full benefit of that freedom of thought[2] which is a fundamental feature of our political institutions." 320 U.S. at page 158, 63 S.Ct. at page 1352, 87 L.Ed. 1796.

The next proposition is to determine the extent of the liberties of the First Amendment. In that connection it must be regarded as also settled that the liberties of the First Amendment are not absolute liberties, but are subject to a limited restraint. But such restraint "is tolerated by our Constitution only,"[3] under what has now come to be known as the "clear and present danger" rule.

The "clear and present danger" rule is a broad rule, as it necessarily must be. Being broad it cannot and should not be compressed into the narrow confines of a single statement of it or captured in a formula.[4] But the rule has been before the courts often enough that while a standard has not been fixed "by which to determine when a danger shall be deemed clear; how remote the danger may be and yet be deemed present."[5] Nevertheless, it has been so variously stated that guides now exist for testing restraints on what is called the "Minimum compulsion of the Bill of Rights."

In Bridges[6] v. State of California, 314 U.S. 252, at page 263, 62 S.Ct. 190, at page 194, 86 L.Ed. 192, the Court said:

"What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be *extremely serious* and the degree of *imminence extremely high* before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. *They do no more than recognize a minimum compulsion of the Bill of Rights.* For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' *It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow.*" (Emphasis supplied.)

---

1 While these cases involved the Fourteenth Amendment, because they concerned the powers of the various states whose statutes were under consideration, the principle is the same as the courts have repeatedly held that the due process clause of the Fifth and Fourteenth Amendments operate alike in their respective fields. That deduction is made because the due process clause of the Fourteenth Amendment is in the same language as the Fifth Amendment which, of course, preceded it.

2 All the liberties of the First Amendment have an equal standing and none is preferred over the other. Prince v. Commonwealth of Mass., 321 U.S. 158, 64 S. Ct. 438. Supreme Court Number 98 of October, 1943 Term.

3 West Virginia State Board of Education v. Barnette, 319 U.S. 624, at page 633, 63 S.Ct. 1178, at page 1183, 87 L. Ed. 1628, 147 A.L.R. 674.

4 Bridges v. State of California, 314 U. S. 252, at page 261, 62 S.Ct. 190, at page 193, 86 L.Ed. 192.

5 Bridges v. State of California, supra, 314 U.S. at page 261, 62 S.Ct. at page 193, 86 L.Ed. 192.

6 Bridges was an alien at all times during the proceedings.

The fact that the exercise of a liberty of the First Amendment is likely to result in some violence is not enough to justify its suppression. There must be the probability of serious injury to the state. Advocacy of ideas or action however reprehensible, is not a justification for denying free speech where the advocacy falls short of incitement, or where there is no exhortation to immediate violence or to crime or other unlawful means, and there is nothing to indicate that the advocacy must be immediately acted on. In order to support a finding of clear and present danger it must be shown either that immediate serious violence was to be expected, or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated. These are some of the guides which are set out in the concurring opinion of Justice Brandeis in the Whitney case, supra, and now accepted as settled.

Freedom of thought, speech, and assembly is the rule; abridgment of that freedom is the exception.[7]

It is an elementary rule of pleading that when a cause of action is based upon an exception to a general rule, sufficient facts must be alleged to bring the action clearly within the exception. It is the exception which gives rise to the cause of action. Facts must be pleaded which on their face justify a deviation from the general rule and the application of the exception. If no exception is shown, no cause of action is stated.

The complaint here is based on the exception to the general rule which constitutionally grants freedom of thought, speech, and assembly.

Such an exception applies and may be invoked only in cases of clear and present danger of serious and imminent injury to the state.

Such clear and present danger must have existed at the time the acts complained of were committed. In this instance, the period of time is not the present, nor any time since defendant's naturalization, but the five year period prior to his admission.

It follows that when an action is filed to invoke the exception facts must be alleged in the complaint from which it will appear to the court that a clear and present danger does or did exist at the time of the acts or utterances or was created by the thought, speech, or assembly.

This is not so if the action is brought under an act of the legislative body which act has "appraised a particular kind of situation and found a specific danger sufficiently imminent to justify a restriction on a particular kind of utterance."[8] In such a case the legislature brings the law within the exception by reciting and finding that certain facts existed, as a result of which the prohibited conduct would create a clear and present danger. In which latter event, however, the legislative finding or declaration creates merely a rebuttable presumption, which the defendant has an opportunity to meet by evidence that there was no such clear and present danger.[9]

In the naturalization[10] and immigration laws[11] Congress has done that very thing. It absolutely prohibited entry into the country or the naturalization of anarchists, political assassins, and polygamists. There Congress "appraised" the situation and "found a specific danger sufficiently

[7] Herndon v. Lowry, 301 U.S. 242, at page 258, 57 S.Ct. 732, at page 739, 81 L.Ed. 1066.

[8] Bridges v. State of California, supra, 314 U.S. at page 260, 62 S.Ct. at page 192, 86 L.Ed. 192.

[9] Whitney v. People of State of California, supra, 274 U.S. at pages 374 and 378, 379, 47 S.Ct. at page 649, 71 L.Ed. 1095:

"'Inasmuch as this act concerns and is necessary to the immediate preservation of the public peace and safety, for the reason that at the present time large numbers of persons are going from place to place in this state advocating, teaching, and practicing criminal syndicalism, this act shall take effect upon approval by the Governor.' * * *

"The *legislative declaration*, like the fact that the statute was passed and was sustained by the highest court of the State, creates merely a rebuttable presumption that these conditions have been satisfied."

Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Bridges v. State of California, supra; Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470.

[10] Section 7, Act of 1906, 34 Stat. 598; Nationality Act of 1940, Sec. 305, 54 Stat. 1141, 8 U.S.C.A. § 705.

[11] Sec. 3 Immigration Act of 1917, 39 Stat. 874, now 8 U.S.C.A. § 137.

imminent" to result from the presence in the Country or naturalization of anarchists, polygamists, and political assassins to justify their exclusion and denial of citizenship to them.

But there is no comparable enactment concerning one who advocates the doctrines charged against the Bund, or any other political philosophy.[12] It cannot be said that Congress has seen any danger in any other doctrine than those which it thus chose to categorize and specifically prohibit.[13]

Congress did not define the "circumstances" under which a clear and present danger would exist generally. Congress did not prohibit the doctrines of the Bund or specifically deny citizenship to its members or the adherents of its doctrines as it did with anarchists, political assassins, polygamists, and those who advocate the overthrow of the Government by force and violence. It follows that defendant's membership in and activities in connection with the Bund are not enough standing alone to state a cause of action for cancellation of citizenship. Such membership and activities standing alone come within the protection of the general constitutional rule which guarantees freedom of thought, speech, and assembly. Under general rules of statutory construction the failure of Congress to list Bundists with anarchists, political assassins, polygamists, and advocates of force and violence to overthrow the government, excludes the Bundists from the absolute penalty of non-admission to citizenship, which attaches to the latter. The exception to this general rule arises when a clear and present danger is created or caused because of special circumstances. Therefore, such circumstances must be pleaded or facts stated which show how the clear and present danger is created, when thought, speech, or action, other than the positively prohibited ones, is depended upon as a ground for relief in a cancellation proceeding, such as this one.

Hence, for the Government to be properly in court, there must be allegations of fact in the complaint from which it can be concluded by the Court that the defendant's membership in the Bund and his activities in and in connection with it either themselves created a clear and present danger at the time of their doing, or that such circumstances then existed that from the "proximity and degree"[14] of such membership and activities, such danger was "extremely serious and the degree of imminence extremely high."[15]

An illustration will serve to emphasize the requirement of pleading facts to show the clear and present danger. The example most often used to illustrate the clear and present danger rule is that one cannot yell fire in a crowded theater, which stems from Justice Holmes' Opinion in the Schenck case, supra.[16] A law which made it an offense to yell fire in a crowded theater would be a proper restriction of the liberty of free speech. An indictment which merely alleged that the defendant falsely yelled fire in a theater, would not state an offense, *unless it also alleged that the theater was crowded at the time.*

The Schwimmer case, Schwimmer v. United States, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889, as well as the Macintosh case, Macintosh v. United States, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302, are neither of them in point here, as each of them was an appeal on a petition for naturalization, and in each of them, the alien either refused to take the statutory oath, or admitted lack of attachment to the principles of the Constitution. If they are not overruled by the Schneiderman case their authority was greatly weakened by the acceptance of the dissents in each of them.

---

12 For record of efforts to amend the Immigration and Naturalization laws to include others than anarchists, etc., in the prohibited category, see Schneiderman, supra. Footnotes 8 and 18, 320 U.S. at pages 132 and 139, 63 S.Ct. at pages 1340, 1343, 87 L.Ed. 1796.

13 Whether the failure of Congress to so prohibit the doctrines of the Bund compels the abatement of this action on that ground is not involved in the consideration of this point because it is conceivable that if the elements of extrinsic fraud are properly pleaded as well as the existence or creation of a clear and present danger, that such an action would lie.

14 Schenck v. United States, 249 U.S. 47, at page 52, 39 S.Ct. 247, at page 249, 63 L.Ed. 470.

15 Bridges v. State of California, 314 U.S. 252, at page 263, 62 S.Ct. 190, at page 194, 86 L.Ed. 190.

16 Schenck v. United States, 249 U.S. 47, at page 52, 39 S.Ct. 247, at page 249, 63 L.Ed. 470. The exact quotation is "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic."

Schneiderman v. United States, supra, 320 U.S. at pages 138, 139, 63 S.Ct. at page 1343, 87 L.Ed. 1796. Moreover, it might well be that all of the acts and conduct of the defendant charged against him in the complaint in this case were before the naturalization court at the time of its judgment admitting him as a citizen, so far as the complaint here is concerned. There is no allegation to the contrary.

If the position taken by the Government in this case is the correct one, it would logically follow that the Government could appear on the hearing of a petition for naturalization, and in opposing the granting of it, introduce all of the evidence of membership in the Bund and the like, which is alleged here. Then if the court granted citizenship, the Government could appeal. If the granting was confirmed by the Circuit Court of Appeals, it could appeal to the Supreme Court, and then if the Supreme Court affirmed the judgment admitting the alien, *the Government could the very next day start all over again, by the mere allegation that the defendant swore falsely,* and introducing the identical evidence as before, could repeat the whole process including the appeals. Such a situation defies even the simplest rules for the repose of judgments.

Fiske v. State of Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108, was decided the same day as the Whitney case, supra. A conviction was had under the Kansas Criminal Syndicalism Act. On appeal no attack was made on the constitutionality of the statute, but the sufficiency of the information was challenged. In that connection the Court said 274 U.S. at page 387, 47 S.Ct. at page 657, 71 L.Ed. 1108:

"The result is that the Syndicalism Act has been applied in this case to sustain the conviction of the defendant, without *any charge* or evidence *that the organization in which he secured members advocated any crime, violence or other unlawful acts or methods as a means of effecting industrial or political changes or revolution.*"

The conviction was reversed.

Fontana v. United States, 8 Cir., 262 F. 283, decided nine or ten months after the Schenck case, supra, was a criminal case under the Espionage Act of 1917. The court held that the indictment failed to state an offense, for the reason that, among other things, no facts or circumstances were set forth from which the court could ascertain that the acts charged would or did create a clear and present danger.

Said the Court, 262 F. at page 288:

"Whether or not the statements in the indictment were reasonably calculated to indicate the intents stated or to 'create a clear and present danger' of the results alleged, was conditioned by the time and circumstances in which they were said. It is an elementary rule of criminal law that when language does not constitute a crime if uttered under some circumstances, and does constitute a crime if uttered under other circumstances, it is not enough to charge that it was used with intent to violate the law. That would be a mere conclusion. The facts must be set forth, so that the court can determine, and not the pleader, whether or not they constitute the crime."

While generally the rules of pleading in a criminal proceeding are more stringent than in an ordinary civil action, the rule of stringency applies in those exceptional civil actions where a penalty or forfeiture is involved. Loss of citizenship is by an action such as this, indeed a forfeiture. "In its consequences it is more serious than a taking of one's property, or the imposition of a fine or other penalty. * * * By many it (citizenship) is regarded as the highest hope of civilized man." Schneiderman v. United States, supra, 320 U.S. at page 122, 63 S.Ct. at page 1335, 87 L.Ed. 1796.

It must be kept in mind also that this is a fraud action, not an ordinary civil action, but one to *set aside a judgment,* and in such an action, the rules of pleading are likewise strict.

Moreover, as seen from the Bridges case, supra, the clear and present danger cases do no more than recognize the *minimum* compulsions of the First Amendment and if a clear and present danger is a minimum requirement, then certainly the most primary rules of pleading and the most elementary conception of due process require that facts constituting such clear and present danger must be alleged in the complaint which seeks a judgment, the result of which would be restriction of the liberties of the First Amendment, or a penalty by loss of citizenship for their exercise.

The Schneiderman case, comprehensive as it is, settles one other thing in connection with the proposition under discussion. That is that the reprehensible purposes of

an organization cannot be imputed to one of its members, "in the absence of *overt acts* indicating that such was his interpretation," and that such overt acts must be more than membership and activity in such organization and subscription to its principles. There must be some other conduct which shows that he believed in and advocated the employment of "force and violence, instead of peaceful persuasion, as a means of attaining political ends."[17]

Thus effect can be given in this case to the declaration of the Supreme Court that, "The only conclusions supported by history is that the unqualified prohibitions laid down by the framers were intended *to give to liberty of the press, as to other liberties, the broadest scope that could be countenanced in an orderly society,*" and that the First Amendment "must be taken as a *command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow.*" Bridges v. State of California, 314 U.S. at pages 265 and 263, 62 S.Ct. at pages 195, 194, 86 L.Ed. 192.[18]

It is implicit in the Constitution that a Nation which is strong enough to proclaim the individual liberties of the First Amendment is strong enough to apply and enforce and preserve them. The history of this Nation is the history of their application and preservation. It has demonstrated that they are strong enough to endure both war and peace. They not only survived through the various wars of this Nation, but, after the worst kind of all wars where brother is set against brother in a fratricidal Civil war, their guarantees were extended as prohibitions against the several States by the due process clause of the Fourteenth Amendment, whereas before, the forbiddance was against the National Government only. During peace times they have survived innumerable ingenious schemes by public bodies and officials, as well as by private organizations, for their restriction or abridgment in zealous efforts to by-pass or ignore them.

In its finality, this action seeks to penalize the defendant on the ground the defendant was not "attached to the principles of the Constitution" because he exercised the rights guaranteed to individuals in the declaration of those principles. In the midst of this war to preserve the liberties set out in those principles, it would be strange indeed to deny them to a man for their exercise when we were not then at war and under conditions where no clear and present danger is alleged to have existed.

"Whatever attitude we may individually hold toward persons and organizations that believe in or advocate extensive changes in our existing order, it should be our desire and concern at all times to uphold the right of free discussion and free thinking to which we as a people claim primary attachment. To neglect this duty in a proceeding in which we are called upon to judge whether a particular individual has failed to manifest attachment to the Constitution would be ironical indeed." Schneiderman v. United States, 320 U.S. 118, at page 139, 63 S.Ct. 1333, at page 1343, 87 L.Ed. 1796.

The complaint is wholly lacking in any allegations or assertions of fact from which it appears that the acts and conduct of defendant as a member of and in connection with the Bund during the "relevant"[19] five-year period prior to his

17 Schneiderman v. United States, supra, 320 U.S. at pages 146, 147, 63 S. Ct. at page 1347, 87 L.Ed. 1796, the following proposition is stated: "Apart from his membership in the League and the Party, the record is barren of any conduct or statement on petitioner's part which indicates in the slightest that he believed in and advocated the employment of force and violence, instead of peaceful persuasion, as a means of attaining political ends. To find that he so believed and advocated it is necessary, therefore, to find that such was a principle of the organizations to which he belonged and then imputed that principle to him on the basis of his activity in those organizations and his statement that he subscribed to their principles", which proposition the Court answers at pages 158, 159 of 320 U.S., 63 S.Ct. at page 1352, 87 L.Ed. 1796:

"We hold only that where two interpretations of an organization's program are possible, the one reprehensible and a bar to naturalization and the other permissible, a court in a denaturalization proceeding, * * * is not justified in *canceling a certificate of citizenship by imputing the reprehensible interpretation to a member of the organization in the absence of overt acts indicating that such was his interpretation.*"

18 Italics supplied here as elsewhere throughout unless otherwise noted.

19 Schneiderman v. United States, 320 U.S. at pages 143 and 155, 63 S.Ct. at pages 1345, 1351, 87 L.Ed. 1796.

252

naturalization, either created a clear and present danger as that term is defined in the cases cited, or that such circumstances existed that the described acts came within such clear and present danger rule as a result of those circumstances.

Hence it is concluded that, not only does the complaint fail to state a cause of action for the reasons set out herein and in the Kusche case in connection with defendant's *Third* and *Fourth* Objections, but entirely apart from those considerations, the complaint fails to state a cause of action for the reasons herein assigned in the discussion of defendant's *Fifth* Objection.

Several amendments to the complaints in all the cases were filed, one after the conclusion of the evidence and the arguments. The Government has chosen to stand on those complaints.

For the foregoing reasons the defendant's motion to strike all of the evidence is hereby granted; the defendant's objection to the introduction of any evidence is hereby sustained, and the within action is ordered dismissed. The Clerk will enter judgment accordingly.

### Addenda.

A copy of the opinion of the Supreme Court in Baumgartner v. United States, 64 S.Ct. 1240, has just come to hand. Although Baumgartner was not charged as a member of the Bund, there is nothing in the opinion contrary to the opinions and conclusions herein expressed. On the contrary it supports these views.